## AS TO THE CENSORING OF MOVING PICTURE FILMS.

Common Pleas Court of Cuyahoga County.

THE EPOCH PRODUCING CORPORATION v. HARRY L. DAVIS, MAYOR
OF THE CITY OF CLEVELAND, ET AL.

Decided, April 10, 1917.

*License—Affirmative Character of the State Law—Creating a Board of
Censors as a Part of the Industrial Commission—Mayors May be
Enjoined from Interfering with the Exhibition of Licensed Films—
"The Birth of A Nation" Under Judicial Review.*

An order issued by the state board of censors permitting the exhibition
of a moving picture film can not be questioned, even in a home
charter city having an ordinance covering the same subject, ex-
cept by application to that board for a review of its action, or by
bringing suit in the Supreme Court to have the order amended, va-
cated or set aside.

FORAN, J.

This is an action for an injunction, brought by the Epoch
Producing Corporation and others against the mayor of the city
of Cleveland and others. Answers have been filed and the case
is being tried as upon final hearing.

It appears from the pleadings that the plaintiff owns and
controls the property of a certain photo-play called "The Birth
of a Nation." That on the 1st day of February, 1917, after
careful examination, the Industrial Commission of the State of
Ohio and the Board of Censors of the State of Ohio approved
said play and granted the plaintiff a certificate of censorship to
the effect that the play was of a moral, educational and harm-
less character; that on February 5th, 1917, the plaintiff en-
tered into a contract with the Euclid Avenue Opera House for
the exhibition of said photo-play in the city of Cleveland, said
exhibition to commence on the 9th of April, 1917, and to con-
tinue for an indefinite period; that on April 2d, 1917, the city
council of the city of Cleveland, by resolution, protested against
the public exhibition of said photo-play; and that thereafter

on the 3d of April, 1917, the defendant, Harry L. Davis, as mayor of the city of Cleveland, wrote a letter to the manager of the opera house informing said manager that he had instructed the director of public safety to take the necessary steps to prevent the exhibition of the play in the city of Cleveland, Ohio. Therefore an injunction is asked to prevent the mayor, the director of public safety and the chief of police from preventing the exhibition of said play.

The city filed an answer admitting many of the allegations in the petition, but claiming that it was the duty of the mayor of the city, under Section 72 of the charter of the city of Cleveland, to act as the chief conservator of the peace within the city, and that the photo-play in question was one that was calculated to and had a tendency to excite and create a breach of the peace, and therefore was in conflict with Section 1770 of the revised ordinances of the city; and for that reason the mayor, acting as the conservator of the peace of the city, did issue an order prohibiting the exhibition of said photo-play, because, if exhibited, it would have a tendency to create and would probably result in a serious breach of the peace; that certain scenes in said photo-play were calculated to cast disgrace upon a large body of self-respecting and law-abiding citizens of the city, and that certain scenes in the play either depict or suggest acts and operations of certain men organized in a conspiracy, secret or otherwise, against law and order and in defiance of governmental authority.

The issues involved in this proceeding are to be governed by the iron rule of legal exegesis, and not by any question of sentiment or expediency. Back of it there may be an underlying suggestion that is political in character, but with this the court can possibly have no concern, as the court must pass upon the issues upon the facts presented and the rules of law prescribed. By this I mean no reflection upon the mayor of this city, whose motives I believe undoubtedly above suspicion.

Sunday evening, at the invitation of counsel for the plaintiff, I witnessed the photo-play, the production or exhibition of which is sought to be enjoined in this proceeding. If I had known in advance as much as I now know of the character of

this exhibition, I could not have been induced by any consideration to witness it.

In the house of memory in which we all live there is a room wherein no one enters save the occupant. For some three hours the door to that room stood open, and out of the abysmal past arose specters that I never expected to see again. In this room "Memory in widow's weeds, on naked feet, stands on a tombstone."

Half a century ago the "memory in widow's weeds" invoked harsh and bitter thoughts; but time steals something from us every hour, and eventually softens, if it does not efface, the bitterness of impressions made in the long ago; so that the thoughts inspired by the scenes I witnessed were tinged with sadness or sorrow and regret rather than with anger or animosity. It is sad now to recall that the War of the Rebellion was necessary in the evolution of the American Republic toward higher idealities and grander realization of human perfection and achievement; and surely it is a matter of regret that men should now seek to capitalize the harrowing scenes of that eventful period in our history. In this production we see reflected a phase of the law of compensation, that immutable law which always has and ever will balance good and evil.

Many of the laws or rules of human conduct, upon which society is based and which pertain to the universe of morals, are mere reflections of immutable physical laws, or perhaps the physical laws grow out of these laws pertaining to the universe of morals. In mechanics the law of compensation means a balancing of forces, such as we see in the law of diminishing returns. So, too, in the moral world we have the law of compensation, a balancing of good and evil. Sowing has its inevitable consequences and concomitant in reaping. If we sow virtue, we reap perfection. If we sow the wind of evil, we reap the hurricane of destruction. The past and present are storehouses where reward and punishment are laid away for the future. The ancients understand this law, and sometimes gave it a very practical application, as in Lex Talionis. Often the wrong-doer escapes the physical penalty; but for the wrong or injustice atonement must be made sometime by somebody. Retributive

justice may travel with a leaden heel, but she never fails to strike, and when she does strike she strikes with an iron hand. The Hindus call this law Karma. The Greeks symbolize it in one of their deities, Nemesis, who was the Goddess of Justice and Divine Retribution. She personified the allotment to every man of his precise share of good and evil. If any man practiced evil, wrought injustice, or was too much uplifted by prosperity, it was the mission of Nemesis to punish him and to humble and reduce him. It was her province to enforce the law of compensation, the law of balancing in the social and moral economy of the universe. A nation or a community is simply man in multitude; and when a nation or its people act, the act is that of the whole or aggregate as well as the act of each. Hence the law of compensation, retributive justice or Nemesis, applies to nations and people with the same force and effect that it applies to individual man. Man's conception of this law harks back to the time he began to emerge from the mists and the shadows of legend and myth. It is most strikingly exemplified in the Vicarious Atonement. The curse of original sin was balanced by the crucifixion and agonizing death of the Son of God.

In the Declaration of Independence as first written by the immortal Jefferson will be found this fearful arraignment of the king of England: "Because he waged cruel war against human nature itself, in enslaving a distant people who never offended him, and carrying them into slavery in another hemisphere, or to incur miserable death in their transportation thither."

This paragraph was stricken out at the instance of the slave-holding aristocracy of the South, and the black spotted curse of human slavery was mockingly perpetuated under the shining folds of the starry flag. When the old Liberty Bell at Philadelphia proclaimed liberty to all the world and the inhabitants thereof on July 4th, 1776, many heard in its clarion, silvery tones an angel song of joy that circled the world; but all detected in this song of joy the doleful clanging of the black man's chains. With liberty were sown dragon's teeth. About eighty odd years thereafter Nemesis brought forth her Jason in the person of the greatest of all Americans, Abraham Lincoln, who destroyed the armed men who sprung from these dragon's teeth.

The law of compensation is one of the instrumentalities in the Divine Economy. Down deep in the heart of a liberty-loving nation there is, as Carlisle said, a smoldering fire; and woe be to the man who gives it vent. When Sumpter was fired upon this smoldering fire was given vent, the dogs of war loosed, and death and havoc stalked through the land. Retributive justice was slow in striking, but she struck with the crashing and crushing force of a thunderbolt. The South was devastated and ruined; but she brought upon herself the curse, and ought not now to be heard to complain.

The photo-play known as the Birth of a Nation deals with and seeks to reproduce in vivid moving pictures the scenes of strife, confusion and social chaos pertaining to what is known as the reconstruction of the states that had seceded from the Union. The name of this photo-play is a misnomer. It ought to be called the "Phoenix of Liberty Arising from the Ashes of Treason."

The reconstruction period in our history is one that no patriotic man or good American now recalls with pride. There were two contending forces, each fully persuaded the salvation of the country depended upon the theory or point of view it advocated. That each was in some measure right, but in large measure wrong, is now conceded by all impartial students of history. After the collapse of the rebellion, the financial and economic condition of the South was extremely desperate. The country was a devastated, disorganized ruin. Railways, bridges and all means of transportation had been destroyed. All securities were valueless. The currency and banking system of the country was in a state of chaotic disorganization. The season for planting crops had almost passed, and the means of planting seed and the seed itself were difficult to obtain. Thousands upon thousands of a recently emancipated race were without work, food or raiment, and were largely dependent upon the meager supply of sustenance furnished by the United States Army. These people, from whom the chains of servitude had just fallen, were made the pawns of war maddened political factions north and south. During the war party lines in the North were obliterated, and the only party that had any reason

for its existence was the party that kept step to the music of the Union. But shortly after the war party lines began to be reasserted, and the question of enfranchising the emancipated race became overshadowing and dominant. Before the war a colored person was classed, under a southern made provision of the Constitution, as three-fifths of a human being. By emancipation the colored person became a whole human being; and this necessarily increased the representation in Congress of the southern states. The radicals in the North, fearing lest the South might again become dominant, desired above all things to enfranchise these people. The old Democratic Party, north and south, believed that, with the accession of this large vote, the Republican Party would be permanently entrenched in power for perhaps a century to come. Hence arose a divergence of opinion and a clash of political ideas. And this contest grew so bitter that I, who was a participant in many of the scenes I witnessed last evening, was frequently of the opinion that the rebellion did not end at Appomattox. Between the Freedman's Bureau on the one hand, with its horde of hungry carpet-bagging agents, and the Ku Klux Klan on the other with its slogan of terrorism, the lot of the colored man was indeed sad and pitiable. The wonder is that the country emerged as readily or as quickly as it did from the saturnalia of political exploitation and racial hatred that threatened to destroy law, order and liberty south of Mason and Dixon's line. The carpet-bagger, for reasons and purposes of his own, treated the emancipated race as an equal. The southern man, who had before and during the war treated these people as mere chattels, found it extremely difficult to meet his former slaves on a plane of equality. Herein the southern man made his great mistake. If he had treated the colored man as an equal, at least before the law, he would have destroyed the influence of the northern carpet-bagger and the so-called scalawag of the South. Liberty is an intoxicant to a recently enslaved man; but the colored man became no more intoxicated by this draught of liberty than did the French during the French Revolution. Indeed, the intoxication and drunkenness of the French on liberty produced a saturnalia of crime that horrified mankind and shocked the sense of humanity

the world over. The wonder is that the colored man was as calm and as quiet as history shows he was, under all the circumstances. There were wrongs on both sides; but no one now seeks to condone the extreme views and measures of Thaddeus Stevens, who is parodied as Stoneman in the photo-play; and the southern historian, William Garrott Brown, admits that the Ku Klux Klan often resorted to violence, and that negroes as well as carpet-baggers were whipped and flogged and murdered. He further admits that the incidents related by Tourgee in "A Fool's Errand" have their counterpart in testimony before congressional committees and courts of law. Such works as "The Clansman" or "The Fool's Errand" really serve no useful purpose; but man will be man through all eternity, and appeals will always be made to passion, bias and prejudice so long as money can be coined out of these appeals.

The claim that "The Birth of a Nation" is historically accurate is seriously made by the plaintiff. This may be true in a measure so far as the scenes depicted are concerned; but no man having any regard for historical fact will contend that the whole truth is told; and, so far as it is told, it is sadly twisted and distorted. The monograph or scenario of the play has a sectional slant and bias. It is tinged with the viewpoint and bias of the man who wrote it; and evidently he is not far enough removed from the period of which he writes to be wholly unaffected by environment. It must be admitted that novel writers and dramatists are often romanticists who draw largely upon their imagination for facts. An historical drama absolutely true to fact would be a stale, flat and unprofitable venture for a theatrical manager or producer.

While I am fully persuaded this photo-play is not educational or productive of patriotic outbursts of enthusiasm of a united people, and while I can see many reasons why its production was a mistake, and that its exhibition will serve no useful purpose, yet I can see no reason why broad-minded men should permit themselves to be disturbed by it. The modern dramatist or writer of scenarios is not a classicist, nor has he an exalted conception of the real province of romanticism. The ordinary theater-goer pays his money to be amused, not to be

educated, socially benefitted or morally improved; and the manager caters to the base passions and the hedonistic, and not to the classical taste of the community. Men prefer to see the foibles and idiosyncracies of their neighbors exploited rather than to see the mirror held to nature when it exposes their own sins and short-comings. Hence we have the stage Irishman, the stage Hebrew, the stage colored man and the stage German in unseemly and grotesque caricature, which, if taken seriously, frequently reflects odiously upon the racial characteristics of these people; but these crude, clownish exhibitions appeal only to ignorant, depraved, satiated pleasure seekers. A real man is disgusted by them.

It is claimed by the plaintiff's counsel that this photo-play projects upon the screen of today the colored man as he appeared emerging from the horrors and shadows of slavery, and is not intended to depict the race as we find it today. Admitting this to be true, what useful educational purpose is served by showing us a race in "widow's weeds, with naked feet, standing on a tombstone"? Of course, the colored race as we see it today is not to be measured by that race as it emerged from the brutal serfdom of the southern plantations.

About thirty-seven years before the Revolutionary War, Governor Fletcher, of the Colony of Virginia, issued a proclamation in which he said, among other things, that he thanked God there were no schools, newspapers or periodicals in the colony, as these things had a tendency to make the people dissatisfied, and therefore they were an abomination.

Obviously the southern planters did not educate the negro or give him an opportunity to acquire the art of reading and then place in his hands books, newspapers and periodicals, for surely such a course would tend to enlighten the slave and cause discontent, and this the slave owner sedulously sought to prevent; but fifty odd years of freedom, schools and changed social environment have wrought wonders for this people. We now find them prominent in agricultural, mercantile and industrial pursuits. In all the professions they have challenged the supremacy of the European and his descendants, and are holding their own. Races who boast their civilization extends back to

the time man emerged from the shadows of barbarism meet the colored man, only recently emancipated, in competition in all the avenues of trade, commerce, literature and social life, and find him a competitor worthy of admiration and respect. Indeed, it must be admitted that this race has made more progress in fifty years than some of the races of southern Europe have made in three hundred years. It seems to me that, with this wonderful progress and achievement to their credit, the men of this race can, like the rest of us, afford to laugh at and ignore the gibes of the clown and the sneers of the unthinking rabble.

It is somewhere said of an old saint that he was informed of certain slanders that were in circulation concerning his character and standing in the church; and it was suggested that he ought to take prompt and energetic measures to suppress these libelous or slanderous utterances. It is said that the old saint replied that if the things said concerning him were true, he ought not to be heard to complain; but if they were not true, then he should, by leading the most exemplary life and by conduct above reproach, convince his neighbors by his conduct and by his acts, rather than by words, that the slanders were false, groundless and untrue. I often think this would be a good course for all of us to follow.

Turning now to the incidents of this play, it may be said without fear of contradiction that scenes are depicted which have but very slight foundation in fact, if any at all. The purpose of the man who wrote the book "The Clansman," or the man who wrote the scenario based upon this book, is evidently not above suspicion. That it was wholly disinterested and patriotic will hardly be admitted by any student of history. A single incident in the play will suffice to show the bias and bent of the author's mind and the purpose in view. The character of Flora Cameron, from the very inception of the play, is prominently in the foreground. Indeed, this character seems to be the *deus ex machina* of the whole play. This character is so drawn that the audience must necessarily become interested in the figure or character. The sprightly naivette of Flora and her charming innocence and childish exuberance of spirit is well calculated to cause the audience to become sympathetic and fall in love with

the character; and evidently all this is done for the purpose of causing the audience a severe shock and jolt by her tragic death. In this respect I am free to say that I think the photo-play is inartistic and stagey, and that this character is a dramatic or stagey trick to serve a sinister purpose. Besides, it is a travesty on historical fact, or at least a gross and misleading exaggeration. It is now well known to all writers of history, and it is especially well known to us who were participants in this great drama, that the southern men left their wives and mothers, their daughters and their sisters and their women generally in charge of and under control of their faithful slaves while they went to the front, and with all the power at their disposal sought to destroy their country. They had full confidence that these slaves would protect the lives and the virtue of their wives, their daughters, their mothers and their sisters; and I know of no incident during that tragic period where this confidence was misplaced or betrayed. On many occasions when in front of Petersburg the cavalry division to which I was attached made extended raids into the enemy's country south of Petersburg; and I can now distinctly recall that whenever we came to a plantation house or farm house the old colored men stood guard over these houses and their inmates until such time as the officers placed a guard of Union soldiers around the house or plantation; and the loyalty and devotion of these slaves to their mistresses and the women of their master's household was a matter of common, every-day observation among the Union troops. It is barely possible that after the southern men permitted the adventurers and demagogues from the North to sow the seeds of distrust and suspicion among the colored people this loyalty and devotion was to some extent lessened; but, as I have said, if the southern men themselves had accepted the situation in good faith, and had treated their former slaves with even a semblance of equality, the voice of the carpet-bagger would have fallen upon deaf ears.

The character of Silas Lynch, if it is intended to represent John R. Lynch of Mississippi, is not only a caricature and a travesty, but a falsification of history. John R. Lynch was so well thought of by his friends in the Republican Party that

he presided as the temporary chairman of the convention that nominated James G. Blaine for the presidency. This man was regarded, as I personally know, by all who knew him as a gentleman, a scholar and a law-abiding citizen. The make-up of this character, however, rather seems to intimidate that it is intended to represent Senator Bruce of Louisiana. This man I knew personally in Washington, and can say without fear of contradiction that if it is intended to typify Silas Lynch as a representative or embodiment of Senator Bruce, the character is not only overdrawn, distorted and a travesty, but it is absolutely false and untrue.

During the performance or exhibition I was somewhat impressed with the fact that there was a great deal of prominence given to the music or air of Dixie Land, and the music of the Star Spangled Banner is noticeable by its absence. This omission and this prominence of Dixie Land can perhaps be condoned or overlooked by the old soldiers for the reason, as Mr. Lincoln said, that the Confederates stole Dixie Land, which was a northern air written by an Ohio man, Emmett, and that inasmuch as we recovered it at Appomattox, it is now as much our air or as much our song as it ever was that of the Confederates, if not more so.

I think it must be admitted that this presentation of a forgotten era is an apology for conduct and for acts that can not be commended or condoned. And even if we admit that right after the war the colored people got drunk on liberty, and while in this intoxicated condition committed acts that can not be commended or condoned, yet I can see no good reason for now calling attention to these things. And if every man felt as I did about it, this play would be exhibited to empty seats at the opera house.

But the question before the court is not one of sentiment, it is not one of personal inclination, it is a question of law pure and simple. Will the exhibition of this photo-play have a tendency to provoke a breach of the peace? Certainly, so far as law-abiding citizens are concerned, such a tendency does not exist and can not be seen; and I am frankly of the opinion that the only way to treat this so-called drama is to treat it with

the silence of contempt. Indeed, the colored people of this country, by their attitude toward this play, have done more to make it a money-making success than all the other advertising it has received. By their conduct and by their attitude they are saving the management thousands upon thousands of dollars in advertising. It is ephemeral in character; and while it is now claimed that several hundred thousand people, if not several million, have witnessed this play, yet it will not be heard of or known of a few years hence, and will be buried in the limbo of forgotten things. In other words, it will fall into the well-merited obscurity out of which it should never have arisen.

To admit that this photo-play tends to provoke a breach of the peace is to confess that citizens of African descent are not law-abiding citizens. This I am not willing to admit, as it would be an uncalled-for slander upon these citizens. A "tendency to provoke a breach of the peace" does not mean a manufactured tendency, but rather it means, as applied in this instance, something the natural effect and tendency of which would be to unconsciously and spontaneously cause men to lose control of their reason and permit passion and anger to dominate judgment. The very absurdity of the travesties presented by this play precludes such a possibility upon the part of men of reason and of common sense. The play, taken as a whole, has no real artistic merit; nor has it any historical or educational value. It undoubtedly has a spectacular and sensual appeal, such an appeal as the Circus Bavimus or the Coliseum afforded the Roman populace under Nero and Caligula.

I sympathize with the people who oppose the exhibition of this film. These people have all the mysticism of the Slav and all the sensitiveness of the Celt. Their extremely sensitive nature is often a detriment rather than a blessing. They sometimes feel any restraint of collective or individual action is a racial or color discrimination. This is a mistake, except in so far as the self-conscious holier-than-thou fool is concerned. The real man, no matter of what race or creed, knows that mind is the supreme law of human destiny, and that all men are to be measured by mind and character. This is a divine conception. When the people of Israel clamored for a king, God, in direct-

ing his prophet to find a suitable person to be king for these people, cautioned him that while man looked upon the outward appearance, God looked only upon the heart. To Tilman Joy the soul of Banty Tim was as white and noble as ever resided in the body of man; and any man who does not feel as Tilman Joy felt is an unspeakable ass, unworthy of consideration or notice. Whenever I see the sneering look of a Pharisee or hypocrite, I feel like repeating the lines of an old French poem which, freely translated, ran:

"The noise is for the foolish; the complaint is for the stupid. The honest man, deceived, goes his way and says no word."

Whatever views the court may have as to the expediency or propriety of this photo-play or exhibition, as was said in the beginning, the court must be governed by the iron rule of legal exegesis, and not by any question of sentiment or personal predilection.

Learned counsel for the city, in their argument, contend that because of the home-rule amendment to our Constitution, the city has full power and authority, through its mayor, to act as the chief conservator of the peace within the city, and to supervise the administration of the affairs of the municipality and see that the ordinances are enforced.

The amendment giving to municipalities the power of local self-government or home rule prevents the exercise of that power if it be in conflict with the general state statutes or laws. Freeholder charters have been liberally construed by courts of last resort in favor of the municipality, the-courts going so far as to hold that under these charters a city may pass any ordinance relating to a municipal affair that the state itself might enact under its Constitution. In other words, the Legislature has power to confer by statute upon the mayors of municipalities the duties of censorship respecting the production of plays, including moving picture exhibitions; and in the absence of any state law in relation to censorship, a city acting under a home-rule charter undoubtedly has authority and power, by ordinance, to provide for censoring plays and theatrical exhibitions. The state has seen fit, however, by a general law to locate the

power of censorship in another body, and therefore the exercise of this power is forbidden to municipalities acting under home-rule charters. It is claimed that the acts of the mayor, so far as they relate to the preservation of law and public peace, can not be enjoined. This is true if the mayor is acting in a purely ministerial capacity. A ministerial act may be said to be a simple definite duty arising under conditions admitted or proved to exist and imposed by law. Under such conditions there is no exercise of judgment by the mayor upon the propriety of the act to be done. But the proposed act of the mayor is not a ministerial act within this definition. The duty which it is said the mayor is about to perform can not be said to arise under conditions that are admitted or have been proved to exist; nor can it be said that the power he is proposing to exercise is a power imposed by law irrespective of the exercise of his discretion or judgment upon the propriety of the contemplated act.

If the act of the Ohio Legislature creating a board of censors provided for an appeal to this court, much of the law cited by counsel would be appropriate; but, unfortunately for the position taken by counsel, the Legislature did not provide in the statutes in question for an appeal to this court. In the case cited by counsel for the plaintiff, being the case *In the Matter of the Franklin Film Manufacturing Corporation,* found at page 422 in the 253 Pa. St. Reports, it is provided in the first syllabus that:

"Under the act of May 15, 1915, P. L., 534, Section 26, creating a state board of censors of motion pictures, 'that a right of appeal from the decision of the court to the court of common pleas of the proper county,' the decision of the board of censors can be reversed by the common pleas court only where there is a finding that the censors were guilty of an abuse of discretion."

It will be seen here that the Pennsylvania act creating a state board of censors expressly gives a right of appeal from the decision of the board to the court of common pleas of the proper county. The Ohio act does not give this right of appeal. And this brings us to a consideration of the Ohio act. But before referring to these statutes it may be well to indulge in a few gen-

eral observations respecting the common and ordinary meaning of the word censor.

Originally a censor was a Roman magistrate who was a rigid judge of morals and whose power was absolute. In the etymology of the word, as it comes down to us, there lurks the dominant idea of an arbitrary assignment of powers and duties; and it may be said that this idea of discretionary power in the censor has never been wholly lost. In American constitutional history we find censors were provided by the organic law of Pennsylvania as late as 1790, and in Vermont as late as 1870, when they were abolished by the constitutional convention of that year. The powers of these censors to inquire into the conduct of state officers and the working of laws and departments of government were not only discretionary, but practically absolute. In Vermont they had power to call constitutional conventions if they believed amendments to the Constitution necessary. In England the power of censorship as to plays and theatrical productions is vested in the Lord Chamberlain and his deputies. His powers in this respect have always been absolute—so much so that when the bill of 1773 became a law, Lord Chesterfield said in opposition to it that "if the players are to be punished, let it be by the laws of their country, and not by the will of an irresponsible despot."

This law and the act of 1843 was in active force until 1909, and in most respects is still in force.

By the terms of these acts, a copy of every new play and every addition to an old play had to be sent to the Lord Chamberlain; and if he did not forbid it within seven days, it could be represented or produced; otherwise not. A joint committee in 1909, however, recommended that it should be optional with an author to submit a play for license and legally to perform an unlicensed play, whether submitted or not, the author, however, taking the risk of police intervention if the play did not meet the approval of the Lord Chamberlain. The committee also recommended that "the reasons for which a license should be refused should be indecency, offensive personalities, the representation in an invidious manner of a living person or a person recently dead, violation of the sentiments of religious reverence, the presence

of anything likely to conduce to crime or vice, or to cause a breach with a friendly power or a breach of the peace.''

This language is strikingly similar to the statutes cited by the learned counsel, Mr. Martin, in his argument.

I only refer to these matters for the purpose of calling attention to what the Legislature of Ohio had in mind when it enacted the censorship statutes. These statutes, as found in Volume 1 of the supplement, beginning with Section 871-46, provide substantially:

1. That there shall be created, under the authority and supervision of the Industrial Commission of Ohio, a board of censors of motion picture films.

2. It shall be the duty of the Board of Censors to examine and censor, as is provided in the statutes, all motion picture films to be publicly exhibited and displayed in the state of Ohio.

3. Only such films as are, in the judgment and discretion of the Board of Censors, of a moral, educational or amusing and harmless character shall be passed and approved by the board.

4. When a film has been censored by the Board of Censors, a certificate showing the approval or rejection of such films shall be issued to the party submitting the film. The board is authorized to recall any film for re-censor, or to revoke any certificate permitting exhibition of any film in the state of Ohio, whenever in the judgment of such board the public welfare requires it.

5. The Board of Censors may work in conjunction with any censor board or boards of legal status of other states as a censor congress, and the action of such congress in approving or rejecting films shall be considered as the action of the board.

6. By Section 871-52 it is made a misdemeanor punishable by a fine of not less than $25, nor more than $300, or imprisonment not less than thirty days nor more than one year, to publicly exhibit or show any motion picture within the state of Ohio unless it shall have been passed or approved by the Ohio Board of Censors or the congress of censors; and a justice of the peace, a mayor or police judge shall have final jurisdiction within his county in a prosecution for a violation of the provisions of the statute relating to the regulation and censoring of motion picture films.

7. By Section 871-53 it is provided that any person in interest being dissatisfied with any order of the Board of Censors shall have the same right and remedies as to filing a petition for hearing on the reasonableness and lawfulness of any order of the board, or to set aside, vacate or amend any order of the board, as is provided in the case of persons dissatisfied with the orders of the Industrial Commission.

In an opinion by the Attorney-General found in Volume 1 of the opinions of 1914, at page 1048, it was held that any person in interest who was dissatisfied with any order of the Board of Censors could make his application to the Board of Censors for a revocation of the order or the amendment of it, and not to the Industrial Commission; clearly indicating, in the opinion of the Attorney-General, that the Board of Censors created by the statute had extraordinary and discretionary powers, subject only to review in the manner provided by law for the review of the decisions and orders of the Industrial Commission; and this review can only be had in the Supreme Court, in accordance with Section 871-38, General Code.

The Board of Censors is created by authority of the Industrial Commission; and it is provided by Section 871-25 that all orders of the Industrial Commission in conformity with law shall be *prima facie* reasonable and lawful, until they are found otherwise in an action brought for that purpose pursuant to the provisions of Section 41 of the act, or Section 871-41, G. C., or until revoked by the commission; and, of course, this applies to all acts of the Board of Censors, as that board is created by the Industrial Commission and is really a part of the commission.

By Section 871-38 it is provided that any person in interest who is dissatisfied with any order of the commission—and, as we have seen, this includes any order of the Board of Censors—may commence an action in the Supreme Court of Ohio against the commission as defendant, to set aside, vacate or amend any such order, on the ground that the order is unreasonable or unlawful. By the provisions of this section the Supreme Court "is authorized and vested with exclusive jurisdiction to hear and determine such action."

It therefore clearly appears that when the Board of Censors, which is part of the Industrial Commission, has made an order or given a permit or a license permitting the exhibition of a motion picture film, this order can not be questioned in any way, except as is provided in these statutes, and that is by an application to the Board of Censors to review its own action, or by commencing an action in the Supreme Court of Ohio to have the order set aside, vacated or amended. The language of the statute is clear and explicit that the Supreme Court is vested with exclusive jurisdiction to hear and determine any action which any person in interest who is dissatisfied with an order of the Board of Censors may bring to have that order vacated, amended or modified. We think there can be no question as to the soundness of this view. The statutes creating a Board of Censors are what may be termed affirmative statutes; that is, statutes enacted in affirmative terms, and they are not in derogation of common law; and it is a well settled rule of legal interpretation that if an affirmative statute which is indicative of a new law direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner. See Potter's Dwarris on Statutes and Constitutions, page 72, and cases there cited. This learned author on the same page also says:

"If a new power be given by an affirmative statute to a certain person by the designation of that one person, although it be an affirmative statute, all other persons are in general excluded from the exercise of the power, since *expressio unius est exclusio ulterius.*"

Section 871-53, providing that any person in interest who is dissatisfied with an order of the Board of Censors shall have the rights and remedies as to filing a petition in the Supreme Court for a hearing on the reasonableness and lawfulness of any order of the Board of Censors, or to set aside, vacate or amend such order, as is provided in the case of persons dissatisfied with the orders of the Industrial Commission, was held in *Mutual Film Corporation* v. *Industrial Commission of Ohio*, 205 Federal Reporter, 138, to give sufficient protection against an arbitrary or

unreasonable action by the Board of Censors.    This case was affirmed by the Supreme Court of the United States in 236 U. S., 230.

If this section of the statute gives sufficient protection against arbitrary or unreasonable action by the Board of Censors, there is no reason why the mayor of the city of Cleveland should undertake to exercise any authority in respect to the matter. Clearly and obviously these sections of the statutes of Ohio give the Board of Censors absolute power and authority to reject or approve any film, and the right of the board to do so can only be reviewed in the Supreme Court of the state of Ohio; and this court must necessarily hold, and is forced to hold, that the contemplated action of the mayor of the city of Cleveland, no matter how well-intentioned such action may be, is without authority and void.

If the court were permitted to exercise its own judgment as to the propriety or the expediency of exhibiting this film, it would undoubtedly say that the photo-play under consideration is neither educational, moral or socially uplifting; and I may further say that, having seen this film exhibited, I could not be again induced, even for a consideration, to witness a performance or exhibition of it.    But under the law as I find it, I am constrained and forced, as I have said, to hold that the action of the mayor is without authority, and is contrary to law, and therefore void; and he will be enjoined and the prayer of the petition will be granted.