**RUSSELL v STATE BRIDGE COMM.**

Common Pleas Court, Frank!in Co.

No. 158153. Decided Feb. 2, 1940

James Metzenbaum, Cleveland, for plaintiff.

Thomas J. Herbert, Attorney General, Columbus; Huntington & Holmes, Special Counsel, Columbus; Isadore Topper, Special Counsel, Columbus, for defendant.

## OPINION

By TURNER, J.

The plaintiff seeks to test the constitutionality of the State Bridge Commission Act, §1084-1, et seq GC.

The Attorney General has filed a demurrer to the amended petition on two grounds:

(1) That the plaintiff does not have legal capacity to sue.

(2) That the amended petition does not state facts which show a cause of action.

Said demurrer is sustained on both branches for the following reasons:

The opening paragraph of the amended petition recites:

"Now comes Joseph G. Russell, the plaintiff in this action and says that he is a resident of Cuyahoga County, an elector and taxpayer therein and is a user of some of the toll bridges purchased by the State Bridge Commission of Ohio, and brings this action in behalf of himself and all other taxpayers, electors and residents of the state of Ohio and in behalf of all users of all of the toll bridges purchased by the State Bridge Commission of Ohio."

The foregoing ipse dixit is plaintiff's only authority or commission for bringing this action.

In his first cause of action plaintiff alleges:

(1) That the State Bridge Commission was created by statute.

(2) Names the members.

(3) Recites the authority of the Commission to purchase or condemn any private toll bridge and issue revenue bonds therefor to be amortized "by the collection of tolls from said bridge".

(4) A legal conclusion that the lack of conformity to certain standards set up by pleader himself violates Sec. 1 of Art. II of the Ohio Constitution.

(5) A recital of the amendment of June 3, 1939, to §1084-10, GC.

(6) Another legal conclusion "that there being no constitutional definitions or standards set up in said act of September 2, 1935, said section, in providing that no 'other condition or things than those proceedings, conditions and things which are specified and required by this act' ", **further** and **additionally offends against said Sec. 1, Art. II, Ohio Constitution.**

(7) A legal conclusion that the State Bridge Commission "is not designated nor constituted a body politic, a political subdivision nor a public corporation and has none of the powers thereof vested in such bodies by the Consitution of Ohio".

(8) "Prior to the enactment of June 3, 1939, the Commission was authorized to and did execute, issue and deliver over five million dollars of bridge bonds without any public advertising or public bidding and without opportunity for competitive bidding."

(9) Further legal conclusions as to the provisions of §1084-15a, GC and an argument that present issued and outstanding bonds need not be paid but may be extended indefinitely "which power and right would be to the injury of the users of the bridges now or in the future purchased by said State Bridge Commission, in that tolls must be charged and collected from all users, so long as any original or refunding bonds shall be in existence or unpaid upon any of said respective bridges.

(10) Quotes part of the provisions of §1084-15a, GC, underscoring the words "additional" and "continued".

(11) The following speculation, argument and conclusion:

· "Plaintiff says that as a result of this newly enacted section the tolls upon any or all of the bridges now or in the future purchased by said State Bridge Commission may be increased and may be continued for long periods after the respective due dates of the present or future originally issued bridge bonds, making possible both an increased and and extended requirement of payment

of tolls on such bridges to the detriment, loss and impairment of the rights of all users, residents and persons within in the state."

"That all of this may come about largely, if not entirely by reason of the lack and absence of constitutional definitions and standards within said Act and the amendments thereto."

(12) Then comes the following history: "Under the authority of the Bridge Commission Act, the Commission has purchased several toll bridges, has financed the purchases by the issuance of bonds in excess of $5,880,000.00 and has paid out large sums of money collected from bridge tolls, in payment of interest and amortization charges on said bonds."

(13) Then follows the legal conclusion, argument and prophecy: "Plaintiff alleges that said past purchases, issuance of bonds and payments made thereon are in violation of the Constitution of the State of Ohio, and are illegal, void and of no effect, and that any further purchases of bridges, issuance of bonds, and payment of principal or interest will be in violation of the constitution of the State of Ohio, and will be illegal.

(14) Allegation of lack of adequate remedy at law.

(15) Sets forth part of §1084-10, GC as amended June 3, 1939, authorizing public subdivisions to purchase bonds issued by the Bridge Commission.

(16) A final legal conclusion that the purchase of bridge bonds by public authorities would impair their funds and **if done** would require increased appropriations to sustain them to the injury of plaintiff and all taxpayers of the state.

Careful scrutiny of this first cause of action fails to reveal any present or threatened injury to anybody.

Taking up the second cause of action:

Plaintiff attempts to "incorporate all of the allegations hereinbefore set forth

in his first cause of action **so far as the same may be applicable"**. This, of course, is not proper pleading. The statute authorizing incorporation does not authorize a violation of the statutory require-ment that separate caus-es of action must be separately stated and numbered. And the "so far as the same may be applicable" does not re-quire the Court to decide or guess what parts plaintiff seeks to incorporate. However, as no valid first cause of ac-tion is set up, we may pass this at-tempted incorporation.

Plaintiff then follows his incorpora-tion paragraph with the following ar-gumentative conclusion:

"Plaintiff further alleges that—large-ly by reason of there being no consti-tutional standards in the State Bridge Commission Act, and also, because of the conduct of the members of said Commission — the defendants, the Bridge Commission of Ohio and the in-dividual members thereof, **have** carried on the work of said Commission, in a manner of abuse of discretion, in that."

Then follows a series of eight legal conclusions in no one of which are the ultimate facts set forth by which the Court may determine whether or not a good cause of action is set forth.

Taking up these eight legal conclu-sions in order and commenting on them in passing, the plaintiff alleges:

(1) "The bridges purchased have been bought at prices grossly in excess of the actual or fair respective values thereof;" not a single instance, not a single detail and all in reference to **past events.**

(2) "Unreasonable and excessive revenue bonds have been issued for said respective bridges." The same com-ment applies here as to (1).

(3) "Some of the bridges purchased have been bought and paid for without sufficient, proper, fair and reasonable investigation, engineer's reports or sur-veys to determine the proper cost price, the condition, fair value or the neces-sity of such purchases or of said bridg-es." In addition to the comment fol-lowing (1) above, it may be added, that if any of the foregoing charges can be substantiated by facts the Bureau of Inspection and Super- vision of Public Offices Act, §274, **GC**, provides for full, adequate and complete relief to the public. Plain, adequate and complete remedy is afforded to an in-dividual by §1084-3 **GC**, which provides that each member of the Bridge Com-mission must furnish a bond in the penal sum of $10,000.00 and by §11242, **GC**, an individual may sue upon such bond.

(4) "Revenue bonds have been is-sued for said respective purchases, at rates of interest, at discounts and at redemption premiums far in excess of the reasonable, proper or fair rates, terms and provisions." Another job for the Bureau of Inspection if the facts bear out the pleader's conclusion.

(5) "Attorney charges and fees have been paid and are now being incurred and paid by said Commission, in ex-cess of what is fair or required and that by reason of §333, **GC**, whereby the At-torney General is made counsel for all departments and boards of the state, no attorney fees were necessary to be incurred or paid." This conclusion would indicate that the pleader was not familiar with the act which he is chal-lenging. The Legislature has the right to modify or even repeal §333, **GC**, if it so determines. It has provided in §1084-6 that the Commission may in addition to engineers, etc., employ at-torneys and fix their compensation.

(6) "That, for attorneys engaged by the Commission, such attorney fees have been secretly and—for the purpose of concealing the same—charged to the respective sellers of said bridges and revenue bonds have been issued to the sellers of such bridges to cover such attorney fees." In addition to what has been said of (1) above, it is to be noted that under §1084-2, **GC**, legal ex-penses are capitalized, i.e., made a part of the cost of the bridge, which is a proper, and indeed the only proper ac-

counting procedure. This same procedure is followed by the Income Tax Authorities.

(7) "That all of the bonds issued by the Commission, $5,800,000.00, have been issued without advertising and without competitive bidding as provided by the Uniform Bond Act, §2293-28, GC, and that by reason of the operations, methods and abuse and lack of discretion on the part of said Commission, no premiums have been collected or obtained upon said bonds in favor of said Commission, excessive rates of interest have been provided in all of said bonds and all of the $5,800,000.00 of bonds came into the possession and control of one single bond house." In addition to the remarks under (1) above, and the concluding non sequitur, plaintiff has overlooked not only the provisions of the Act itself which control (being later legislation) but also the provisions of §1084-16, GC, to-wit:

"This act shall be deemed to provide an additional and alternative method for the doing of the things authorized hereby, and shall be regarded as supplementary and additional to powers conferred by other laws."

(8) "That said defendants are and have been buying all materials, making all repairs, carrying on all of the maintenance work and purchasing all of its maintenance materials without any competitive bidding in connection therewith." Suppose that instead of this conclusion operative facts had been set forth justifying the conclusion, what constitutional provision has been violated? The Legislature has vested this commission with discretion and in the absence of a clear showing of an abuse thereof, the courts will not interfere. Bearing in mind the provisions of §1084-16 GC, quoted above, so long as the Commission follows the law prescribed for them in §1084-1 et seq, GC, no one, and especially one not peculiarly injured thereby may complain.

After setting forth the foregoing series of legal conclusions comes the following paragraph:

"Plaintiff says that he is informed, believes and therefore alleges that the defendants have been negotiations (sic) for, and planning to buy several more bridges, in much the same manner and in quite the same way without the exercise of due or proper discretion and without proper or adequate safeguards to the people of Ohio or to the users of such bridges."

If time and space justified, a large portion of an elementary treatise on pleading could be quoted to show that this paragraph adds nothing to the claimed cause of action. Not an operative fact in the paragraph.

What has been said of the last quoted paragraph may be said also of the next one, save that plaintiff has specified "four additional bridges". Where those additional bridges are located, what prices are to be paid, what surveys, if any, have been made and all other operative facts are omitted, e. g.,

"Plaintiff further says that he is informed and therefore alleges that the said Bridge Commission of Ohio is planning, negotiating and threatening to purchase four additional bridges and to issue bonds to the extent of large sums in payment for said respective four bridges and that unless restrained by this Court, the said Commission will engage in the purchase of further bridges and the issuance of further bonds."

Then follows a four paragraph prayer, the first in argumentative form asking that because of threatened abuse of discretion (nowhere alleged in the body of the petition) defendants be enjoined from purchasing **any** bridges or selling **any** bonds.

The next paragraph is quoted without comment here:

"Plaintiff prays that said Bridge Commission Act be held to be in violation

of the Constitution of the State of Ohio."

The next paragraph prays for a temporary restraining order while the final paragraph prays that interrogatories attached be ordered answered.

This second cause of action, like the first, fails to state facts sufficient to show a cause of action.

As the protection of the citizen from any injury through an unconstitutional act of any kind is the first duty of our courts, we have taken pains to go through plaintiff's amended petition, item by item, to discover, if possible, any injury to plaintiff or those he claims to represent. Failing to find any operative facts showing the probability of injury, the demurrer must be sustained. Courts do not pass upon abstract propositions of law, but even if they did, we would still have to sustain the demurrer.

It may be well to note briefly some elementary legal principles applicable here. The following quotation is taken from 31 O. Jur., p. 663:

"The admission by demurrer is limited to an admission of the truth only of that which is well pleaded—such facts as may be material, and are expressly and properly stated; a demurrer does not, for example, admit the truth of conjectures, or the correctness of a legal conclusion or a conclusion of law, inferences from facts which do not support them, or conclusions from facts, such as the conclusions the pleader has drawn from statutes as facts. Statements of ultimate facts, or a statement of an ultimate fact, when the specific acts are detailed and do not justify them or it, are not admitted by the demurrer, but are mere surplusage."

The following quotation is from 8 O. Jur. 154:

"It is a well established canon of construction that every reasonable presumption be indulged in favor of the constitutionality of a statute."

The following is from 11 O. Jur. 762:

"It is the duty of courts to decide such questions only as become necessary to ascertain the rights of the parties litigant, and such as are legitimately presented by the record; parties have not the power to call for an opinion on a matter not thus presented. * * * In accord with the foregoing principle, the general and abstract question whether an act of the legislature is unconstitutional can not, with propriety, be presented to a court, nor whether a proposed law will be constitutional."

While the first cause of action contains prophecies to the effect that bridges may be bought and bonds issued in the future, nowhere is there a specific allegation of any threat by the Commission to do either. However, in the second cause of action is the "informed, believes and therefore alleges" argumentative and speculative conclusion that "the defendants have been negotiating." In the next paragraph of this second cause of action plaintiff repeats the contents of the preceding paragraph and adds inter alia the word "threatening", and "unless restrained by this Court, the said Commission will engage in the purchase of further bridges and in the issuance of further bonds".

Such vague and indefinite charges are insufficient to call a court of equity into action.

There is, however, a much stronger and disposing reason, the Court has been unable to find any violation of the Constitution.

The State Bridge Commission Act authorizes the acquisition by purchase

or condemnation of privately owned bridges. Just what sort of standards could be set up for such purchase other than what the legislature has provided? Would any one claim that advertising for bids or holding public hearings would be practicable or in the public interest in the purchase of a specific bridge privately owned? The Legislature itself has determined the policy of superseding privately owned toll bridges by publicly owned ones which eventually shall be free of tolls. How is the bridge user hurt? As no monies other than those arising from tolls are used for any purpose under the Act in question, how is the taxpayer hurt? No taxation is involved. The bonds to be issued are revenue bonds only for which no public authority other than the Commission assumes responsibility. The responsibility of the Commission is limited to its bridge revenue from a specific bridge or group of bridges. The Commission has the power under §1084-6, GC, "to employ engineering, architectural and construction experts and inspectors and attorneys and such other employees as may be necessary in its judgment."

Sec. 1084-13 provides in part:

"Tolls shall be fixed, charged and collected * * * subject, however, to any applicable law or regulation of the United States of America or the Public Utility Commission of the State of Ohio."

While the Court here has not taken the time to ascertain what laws or regulations of the Public Utilities Commission may be applicable, the Attorney General in Opinion No. 2711 for 1938 pointed out that by virtue of the foregoing provisions, the Public Utilities Commission has jurisdiction over the bridge tariffs charged by the State Bridge Commission.

If the Public Utilities Commission did not act, there still would be equitable jurisdiction which could be invoked by any toll payer injured. Said §1084-13 further provides:

"Tolls shall be fixed, charged and collected for transit over such bridge or bridges and shall be so fixed and adjusted in respect of the aggregate tolls from the bridge or bridges for which a single issue of bonds is issued as to provide a fund sufficient to pay such issue of bonds and the interest thereon and to provide an additional fund to pay the cost of maintenance", etc.

This section also contains a sinking fund provision. See also paragraph (b) of §1084-15a, GC.

The Court does not mean to say that if it were shown by ultimate facts set forth in a petition by a person injured that the Commission was about to purchase a bridge at a price to be amortized in 30 years which would require an advance in the toll rates permitted to be charged by private companies (§9307, et seq, GC) a court of equity would not give relief. We are here passing upon the case presented by the amended petition.

The Legislature recognizing that as a body it would be impracticable if not impossible for it to carry out the policy it had decided upon authorized the Governor to appoint a Commission of three members according to the standards laid down in §1084-3, GC. (See 16 C. J. S. 349, et seq 236 U. S. 230; 99 Oh St 269). All necessary standards for either purchase or condemnation are provided in §§1084-6, 1084-8 and 1084-9, GC. All necessary standards for the issuance of the revenue bonds to purchase such bridges are set forth in §§1084-10, 1084-15a, 1084-15b, GC. Such bonds must now be sold at public sale; they may not be sold at a price which provides greater than a six per cent interest charge; shall mature in thirty years; may be redeemed prior to maturity,.

and the following other standards are set forth in addition:

"The Commission issuing such bonds may sell the bonds in such manner and for such price as it may determine to be for the best interest of the state * * * taking into consideration the financial responsibility of the purchaser, and the terms and conditions of the purchase and especially the availability of the proceeds of the bonds when required for payment of the cost of the bridges such sale to be made at a price not lower than a price which, computed with relation to the absolute maturity of the bonds in accordance with standard tables of bond values, will show a net return of six per cent per annum to the purchaser upon the amount paid therefor."

It is further provided that the bonds need not be offered to sinking fund trustees; that if there is a surplus from the sale, it shall go into a sinking fund provided, etc.

Under §1084-15a, GC, the Legislature gave to the Commission the power to issue refunding bonds under the Bridge Commission Act, but subject to the further limitations:

"(a) No bridge revenue bonds shall be delivered, except in the amount necessary to provide for the payment of matured bridge revenue bonds or bridge revenue bonds maturing or redeemable within six months including any redemption premium therein."

This gives to the Commission authority to take advantage of a lower interest rate by refunding old bonds which were made redeemable on notice prior to maturity and provides as well for contingencies. How any citizen, user or taxpayer could be hurt thereby has not been pointed out, though attempted.

The foregoing limitation (a) is followed by (b) requiring the rates of tolls to be adjusted so as to provide for the sinking of the refunded bonds and maintenance of the bridge. In other words, if the refunding bonds are sold at lower interest rates, this saving must be reflected in the tolls. Of course, if there were here a specific charge that the Commission was threatening to issue refunding bonds at higher rates of interest than the old bonds, with a substantial running life left, carried, or that the Commission was charging rates higher than justified by the facts, or that the Commission was failing to maintain a bridge or was charging tolls after the bonds on that bridge had been paid off, then a proper plaintiff could state a cause of action.

The amended petition here alleges no operative facts showing either,

(a) Any increase or threatened increase in the tolls of any bridge.
(b) Any additional cost or inconvenience to any user.
(c) Any question of taxation.
(d) Any misapplication of public funds (proceeds of bond issues and toll collections being considered public funds).
(e) Any injury peculiar to plaintiff.
(f) Any injury to the general public.

The act in question does not violate the Constitution. The Court, therefore, has no alternative but must sustain the demurrer to the amended petition on the ground that the amended petition does not state facts which show a cause of action.

### Want of Capacity to Sue.

While want of capacity to sue arises at the threshold, yet as this question in this case is dependent on whether plaintiff shows an injury peculiar to himself, it was first necessary to examine his amended petition to discover whether it stated any cause of action in his favor.

Sec. 4314, GC, authorizes a taxpayer of a municipality to institute a suit when there is no solicitor or where the solicitor fails to act upon request.

Sec. 2922, GC authorizes a taxpayer of a county to institute a civil action when the prosecuting attorney fails upon request to do so.

There are other special authorizations to taxpayers, such as §§12075, 3454, 2913, 5625-37 and 6503, GC.

The Court has not been referred to any section of the General Code under which it is claimed that plaintiff has the right to bring a representative action.

When the Legislature has acted in specific instances such as ▉▉▉▉▉ those cited above, there is a strong presumption that no authority exists outside of such enactments.

The right of plaintiff here is further negatived by the provisions of §333 GC, to-wit,

"* * * When required by the governor or the general assembly, he (the attorney general) shall appear for the state in any court or tribunal in a cause in which the state is a party or in which the state is directly interested."

If a private citizen were permitted to represent the public upon the mere recital that he is representing taxpayers or users of public facilities, orderly government would be greatly handicapped. Under such condition public work could be stopped and permitted to function during the litigation only through courts set in motion by private individuals with motives, good, bad and indifferent. Instead of the legislative and administrative branches of government functioning as independent agencies, their activities would be measured by the chancellor's foot. And as the various chancellors throughout the state wear different sized shoes, there would soon be built up a heterogeneous lot of judicial commands based upon the equities of particular cases which would soon make for chaos in administration.

As said by one authority:

"To extend the doctrine (of taxpayers suits) so as to restrain the acts of a coordinate branch of the government, the injurious effects of which acts are public only, can not be regarded otherwise than as the usurpation of power not conferred."

The present case affords at least two striking illustrations of how such practice would work.

In enacting §1084-15a, GC, the Legislature authorized the Commission to take advantage of the then low interest rate by refunding bonds which were redeemable before maturity.

According to the amended petition herein, $5,800,000.00 of these bonds are outstanding in the hands of a single bond house. It would be conservative to assume that these bonds could have been refunded at an average rate of at least one per cent under what the old bonds called for.

This plaintiff secured a temporary restraining order in this case preventing this refunding. Therefore the Commission may have lost already approximately fifty thousand dollars in interest.

There are on file in this case a stipulation and journal entry to the effect that "the plaintiff waives the right to attack the validity of any bridge revenue refunding bonds to be issued on or in connection with the Sandusky Bay Bridge of Ohio."

If the plaintiff represents, as he claims to, all taxpayers, electors and

users, then there would be no way for any one else to attack the validity of these bonds.

How full of possibilities are such situations; suppose for instance that the house holding all of these outstanding bonds does not want to lose the higher interest rate. A member of the firm or some other taxpayer files a petition challenging the action of the Commission with the result that the Commission may be prevented from refunding until the matter has been through the various courts.

Take the other illustration and draw from it: Suppose the Commission was in fact remiss and was about to sell some questionable bonds. How easy it would be to get a taxpayer even in good faith to bring some sort of an action and then put on such a journal entry as we have in this case.

Suppose a stockholder in a bridge about to be condemned wanted to prevent the taking of his company's bridge. What would there be to prevent him as a taxpayer from bringing such an action as this and holding up the necessary bond issue until the condemnation proceedings had been defeated by lapse of time.

Suppose a disgruntled citizen did not want the state to own a particular bridge, he could tie up the acquisition indefinitely. All of these illustrations could occur without collusion. Cases in Ohio will be found which at first blush seem to hold contrary to this Court's conclusion. However, when the facts are examined it will be found that in each case, the taxpayer has been able to show an injury peculiar to himself or that the action has been brought under one of the enabling acts heretofore mentioned.

Counsel for plaintiff unsuccessfully attacks the doctrine laid down by the Supreme Court of the United States in the case of Mass v Mellon, 262 U. S., 447; see also Premier v Grosscup, 298 U. S., 225.

The Constitution of this state has created a legislative branch of government and has placed upon this branch of government certain limitations all of which the courts will enforce in proper cases. When the people are dissatisfied with legislation, they may resort to referendum and/or elect new legislators.

Various administrative and executive officers have been created under the authority of the Constitution, each of whom is required by **Art. XV, Sec. 7** to take an oath of office to support the Constitution of the United States and the **Constitution of Ohio**. Under Sec. **5 of Art. III** the supreme executive power of this state shall be vested in the governor, while under **Sec. 1** of that same article the executive department of state is provided. Elsewhere in the Constitution provision is made for the government of counties, municipalities and townships.

Clearly where a citizen can not show an injury peculiar to himself, in the absence of statutory authority he has no standing in Court. To hold otherwise, would be contrary to our theory of government and judicial process.

An entry may be drawn sustaining the demurrer to the amended petition on both grounds advanced and dissolving the restraining order heretofore allowed.