## MUTUAL FILM CORPORATION *v.* INDUSTRIAL COMMISSION OF OHIO.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 456.   Argued January 6, 7, 1915.—Decided February 23, 1915.

Where provisions for censorship of moving pictures relate only to films intended for exhibition within the State and they are distributed to persons within the State for exhibition, there is no burden imposed on interstate commerce.

The doctrine of original package does not extend to moving picture films transported, delivered and used as shown in the record in this case, although manufactured in, and brought from, another State.

Moving picture films brought from another State to be rented or sold by the consignee to exhibitors, are in consumption and mingled as much as from their nature they can be with other property of the State and subject to its otherwise valid police regulation, even before the consignee delivers to the exhibitor.

The judicial sense, supporting the common sense of this country, sustains the exercise of the police power of regulation of moving picture exhibitions.

The exhibition of moving pictures is a business, pure and simple, originated and conducted for profit like other spectacles, and not to be regarded as part of the press of the country or as organs of public opinion within the meaning of freedom of speech and publication guaranteed by the constitution of Ohio.

This court will not anticipate the decision of the state court as to the application of a police statute of the State to a state of facts not involved in the record of the case before it. *Quære*, whether moving pictures exhibited in places other than places of amusement should fall within the provisions of the censorship statute of Ohio.

While administration and legislation are distinct powers and the line that separates their exercise is not easily defined, the legislature must declare the policy of the law and fix the legal principles to control in given cases, and an administrative body may be clothed with power to ascertain facts and conditions to which such policy and principles apply.

It is impossible to exactly specify such application in every instance, and the general terms of censorship, while furnishing no exact standard

of requirements may get precision from the sense and experience of men and become certain and useful guides in reasoning and conduct.

Whether provisions in a state statute clothing a board or Congress composed of officers from that and other States with power, amount to such delegation of legislative power as to render the provisions unconstitutional, will not be determined by this court in a case in which it appears that such Congress is still non-existent.

The moving picture censorship act of Ohio of 1913 is not in violation of the Federal Constitution or the constitution of the State of Ohio, either as depriving the owners of moving pictures of their property without due process of law or as a burden on interstate' commerce, or as abridging freedom and liberty of speech and opinion, or as delegating legislative authority to administrative officers.

215 Fed. Rep. 138, affirmed.

APPEAL from an order denying appellant, herein designated complainant, an interlocutory injunction sought to restrain the enforcement of an act of the General Assembly of Ohio passed April 16, 1913. (103 Ohio Laws, 399), creating under the authority and superintendence of the Industrial Commission of the State a board of censors of motion picture films. The motion was presented to three judges, upon the bill, supporting affidavits and some oral testimony.

The bill is quite voluminous. It makes the following attacks upon the Ohio statute: (1) The statute is in violation of §§ 5, 16 and 19 of article 1 of the constitution of the State in that it deprives complainant of a remedy by due process of law by placing it in the power of the board of censors to determine from standards fixed by itself what films conform to the statute, and thereby deprives complainant of a judicial determination of a violation of the law. (2) The statute is in violation of articles 1 and 14 of the amendments to the Constitution of the United States, and of § 11 of article 1 of the constitution of Ohio in that it restrains complainant and other persons from freely writing and publishing their sentiments. (3) It attempts to give the board of censors legislative power,

which is vested only in the General Assembly of the State, subject to a referendum vote of the people, in that it gives to the board the power to determine the application of the statute without fixing any standard by which the board shall be guided in its determination, and places it in the power of the board, acting with similar boards in other States, to reject, upon any whim or caprice, any film which may be presented, and power to determine the legal status of the foreign board or boards, in conjunction with which it is empowered to act.

The business of the complainant and the description, use, object and effect of motion pictures and other films contained in the bill, stated narratively, are as follows: Complainant is engaged in the business of purchasing, selling and leasing films, the films being produced in other States than Ohio, and in European and other foreign countries. The film consists of a series of instantaneous photographs or positive prints of action upon the stage or in the open. By being projected upon a screen with great rapidity there appears to the eye an illusion of motion. They depict dramatizations of standard novels, exhibiting many subjects of scientific interest, the properties of matter, the growth of the various forms of animal and plant life, and explorations and travels; also events of historical and current interest—the same events which are described in words and by photographs in newspapers, weekly periodicals, magazines and other publications, of which photographs are promptly secured a few days after the events which they depict happen; thus regularly furnishing and publishing news through the medium of motion pictures under the name of "Mutual Weekly." Nothing is depicted of a harmful or immoral character.

The complainant is selling and has sold during the past year for exhibition in Ohio an average of fifty-six positive prints of films per week to film exchanges doing business in that State, the average value thereof being the sum of

$100, aggregating $6,000 per week or $300,000 per annum.

In addition to selling films in Ohio complainant has a film exchange in Detroit, Michigan, from which it rents or leases large quantities to exhibitors in the latter State and in Ohio. The business of that exchange and those in Ohio is to purchase films from complainant and other manufacturers of films and rent them to exhibitors for short periods at stated weekly rentals. The amount of rentals depends upon the number of reels rented, the frequency of the changes of subject, and the age or novelty of the reels rented. The frequency of exhibition is described. It is the custom of the business, observed by all manufacturers, that a subject shall be released or published in all theaters on the same day, which is known as release day, and the age or novelty of the film depends upon the proximity of the day of exhibition to such release day. Films so shown have never been shown in public, and the public to whom they appeal is therefore unlimited. Such public becomes more and more limited by each additional exhibition of the reel.

The amount of business in renting or leasing from the Detroit exchange for exhibition in Ohio aggregates the sum of $1,000 per week.

Complainant has on hand at its Detroit exchange at least 2,500 reels of films which it intends to and will exhibit in Ohio and which it will be impossible to exhibit unless the same shall have been approved by the board of censors. Other exchanges have films, duplicate prints of a large part of complainant's films, for the purpose of selling and leasing to parties residing in Ohio, and the statute of the State will require their examination and the payment of a fee therefor. The amounts of complainant's purchases are stated, and that complainant will be compelled to bear the expense of having them censored because its customers will not purchase or hire uncensored films.

The business of selling and leasing films from its offices

outside of the State of Ohio to purchasers and exhibitors within the State is interstate commerce, which will be seriously burdened by the exaction of the fee for censorship, which is not properly an inspection tax and the proceeds of which will be largely in excess of the cost of enforcing the statute, and will in no event be paid to the Treasury of the United States.

The board has demanded of complainant that it submit its films to censorship and threatens, unless complainant complies with the demand, to arrest any and all persons who seek to place on exhibition any film not so censored or approved by the censor congress on and after November 4, 1913, the date to which the act was extended. It is physically impossible to comply with such demand and physically impossible for the board to censor the films with such rapidity as to enable complainant to proceed with its business, and the delay consequent upon such examination would cause great and irreparable injury to such business and would involve a multiplicity of suits.

There were affidavits filed in support of the bill and some testimony taken orally. One of the affidavits showed the manner of shipping and distributing the films and was as follows:

"The films are shipped by the manufacturers to the film exchanges enclosed in circular metal boxes, each of which metal boxes is in turn enclosed in a fibre or wooden container. The film is in most cases wrapped around a spool or core in a circle within the metal case. Sometimes the film is received by the film exchange wound on a reel, which consists of a cylindrical core with circular flanges to prevent the film from slipping off the core, and when so wound on the reel is also received in metal boxes, as above described. When the film is not received on a reel, it is, upon receipt, taken from the metal box, wound on a reel and then replaced in the metal box. So wound and so enclosed in metal boxes, the films are shipped by the film

exchanges to their customers. The customers take the film as it is wound on the reel from the metal box and exhibit the pictures in their projecting machines, which are so arranged as to permit of the unwinding of the film from the reel on which it is shipped. During exhibition, the reel of film is unwound from one reel and rewound in reverse order on a second reel. After exhibition, it must be again unwound from the second reel from its reverse position and replaced on the original reel in its proper position. After the exhibitions for the day are over, the film is replaced in the metal box and returned to the film exchange, and this process is followed from day to day during the life of the film.

"All shipments of films from manufacturers to film exchanges, from film exchanges to exhibitors, and from exhibitors back to film exchanges, are made in accordance with regulations of the Interstate Commerce Commission, one of which provides as follows:

"'Moving picture films must be placed in metal cases, packed in strong and tight wooden boxes or fibrewood pails.'"

Another of the affidavits divided the business as follows:

"The motion-picture business is conducted in three branches; that is to say, by manufacturers, distributors, and exhibitors, the distributors being known as film exchanges. . . . Film is manufactured and produced in lengths of about one thousand feet, which are placed on reels, and the market price per reel of film of a thousand feet in length is at the rate of ten cents per foot, or one hundred dollars. Manufacturers do not sell their film direct to exhibitors, but sell to film exchanges, and the film exchanges do not resell the film to exhibitors, but rent it out to them."

After stating the popularity of motion pictures and the demand of the public for new ones and the great expense their purchase would be to exhibitors, the affidavit proceeds as follows:

"For that reason film exchanges came into existence, and film exchanges such as the Mutual Film Corporation are like clearing houses or circulating libraries, in that they purchase the film and rent it out to different exhibitors. One reel of film being made to-day serves in many theatres from day to day until it is worn out. The film exchange, in renting out the films, supervises their circulation."

An affidavit was filed made by the "general secretary of the national board of censorship of motion pictures, whose office is at No. 50 Madison Avenue, New York City." The "national board," it is averred, "is an organization maintained by voluntary contributions, whose object is to improve the moral quality of motion pictures." Attached to the affidavit was a list of subjects submitted to the board which are "classified according to the nature of said subjects into scenic, geographic, historical, classic, educational and propagandistic."

*Mr. William B. Sanders* and *Mr. Walter N. Seligsberg,* with whom *Mr. Harold T. Clark* was on the brief, for appellants:

The Federal courts have jurisdiction to decide all the constitutional questions, whether Federal or state, presented by the records. *Ohio R. & W. R. R.* v. *Dittey,* 232 U. S. 578; *Siler* v. *Louis. & Nash. R. R.,* 213 U. S. 175, 191.

Appellants are entitled to invoke the protection of the constitutional guaranties of freedom of publication and liberty of the press as fully as any person with whom they do business could do. *Savage* v. *Jones,* 225 U. S. 501, at pp. 519–521; *Collins* v. *New Hampshire,* 171 U. S. 30; *Caldwell* v. *North Carolina,* 187 U. S. 622; *Crenshaw* v. *Arkansas,* 227 U. S. 389, 397; *Kahn* v. *Cincinnati Times Star,* 10 Oh. Dec. 599, aff'd 52 Oh. St. 662.

Appellants' motion pictures are publications and entitled as such to the protection afforded by the freedom

of publication guaranty contained in § 11, Art. I of the Ohio constitution. *Kalem* v. *Harper Bros.*, 222 U. S. 55, 60; *Harper Bros.* v. *Kalem*, 169 Fed. Rep. 61; *Daly* v. *Webster*, 56 Fed. Rep. 483; *Dailey* v. *San Francisco Superior Court*, 112 California, 94; *United States* v. *Williams*, 3 Fed. Rep. 484; *United States* v. *Loftis*, 12 Fed. Rep. 671; *LeRoy* v. *Jamison*, 15 Fed. Cas. 373.

Appellants' motion pictures constitute part of "the press" of Ohio within the comprehensive meaning of that term. They play an increasingly important part in the spreading of knowledge and the molding of public opinion upon every kind of political, educational, religious, economic and social question. The regular publication of new films under the name of "Mutual Weekly" is clearly a press enterprise.

See § 11, Art I, Ohio constitution, providing that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press.

The Censorship Law violates § 11 in that it imposes a previous restraint upon freedom of publication, which applies to all publications whether made through the medium of speech, writing, acting on the stage, motion pictures, or through any other mode of expression now known or which may hereafter be discovered or invented, and upon the liberty of the press. *Dopp* v. *Doll*, 9 O. Dec. Rep. 428; *Judson* v. *Zurhorst*, 10 O. C. C. (N. S.) 289; *S. C.*, aff'd, 78 O. S. 446; Cooley's Const. Law, 3d ed., Ch. XIV, § V, especially 309; Story on the Constitution, 5th ed., § 1182; Black's Const. Law, 3d ed., 658; Paterson on Liberty of Press, pp. 10 and 41; Cooley's Blackstone, 4th ed., p. 1326; *Patterson* v. *Colorado*, 205 U. S. 454, 462; *Dailey* v. *Superior Court*, 112 California, 94; *Ex parte Neil*, 32 Texas Criminal Court, 275; *Cowan* v. *Fairbrother* (N. C.), 32 L. R. A. 829, 836; *Ulster Square Dealer*

v. *Fowler*, 111 N. Y. Supp. 16; *Life Association* v. *Boogher*, 3 Mo. App. 173; *Clothing Co.* v. *Watson*, 168 Missouri, 153; *Atchison &c. Ry.* v. *Brown*, 80 Kansas, 312; Rawle on Constitution, 2d ed., pp. 123, 124; *Levert* v. *Daily States Pub. Co.*, 123 Louisiana, 594; *Sweeney* v. *Baker*, 13 W. Va. 182; *Williams Printing Co.* v. *Saunders*, 113 Virginia, 156; *Williams* v. *Black*, 24 S. Dak. 501.

The constitutional guaranties are not limited to forms of publication known at the time the Constitution was adopted. *Hurtado* v. *California*, 110 U. S. 516, 530; *Boyd* v. *United States*, 116 U. S. 746, 752; *Holden* v. *Hardy*, 169 U. S. 366, 385; *In re Debs*, 158 U. S. 164, 591.

The censorship law is not sustainable as a plan for the regulating of theatres by a system of granting or withholding licenses, because appellants' films are exhibited in churches, libraries, factories, store windows, before open air gatherings, etc. Moreover, even as to theaters, the surrender of the constitutional guaranty of freedom of publication could not be required as a condition precedent to the granting of a license. *Dist. of Col.* v. *Saville*, 8 D. C. App. 581; *People* v. *Steele*, 231 Illinois, 340; *Chicago* v. *Weber*, 246 Illinois, 304; *Indianapolis* v. *Miller*, 168 Indiana, 285; *William Fox Co.* v. *McClellan*, 62 Misc. 100; *Ex parte Quarg*, 84 Pac. Rep. 766; *Empire City Trotting Club* v. *State Racing Commission*, 190 N. Y. 31.

The censorship law cannot be sustained as a proper exercise of the police power, because it directly contravenes the constitutional guaranties of freedom of publication and liberty of the press. *Board of Health* v. *Greenville*, 86 Oh. St. 1, 21; *Lawton* v. *Steele*, 152 U. S. 133, 137; *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Sperry ex rel.* v. *Sperry & Hutchinson*, 94 Nebraska, 785.

The Ohio Motion Picture Censorship violates the provisions of § 11, Art. I of the constitution of Ohio, in that it attempts to delegate legislative power. *Harmon* v. *State*, 66 O. S. 249; *Toledo* v. *Winters*, 21 O. Dec. 171;

*Ex parte Sam Lewis,* 14 O. N. P. (N. S.) 609; *Noel* v. *People,* 187 Illinois, 591; *Kerr* v. *Ross,* 5 App. D. C. 441; *State* v. *Burdge* (Wis.), 37 L. R. A. 157, 161; *Mathews* v. *Murphy,* 63 S. W. Rep. 785.

*Mr. Robert M. Morgan,* with whom *Mr. Timothy S. Hogan,* Attorney General of the State of Ohio, *Mr. James I. Boulger* and *Mr. Clarence D. Laylin* were on the brief, for appellees.

See brief on behalf of State of Kansas in No. 597, *post,* p. 253.

By leave of court, *Mr. Waldo G. Morse* and *Mr. Jacob Schechter* filed a brief as *amici curiæ* in behalf of the Universal Film Manufacturing Company.

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

Complainant directs its argument to three propositions: (1) The statute in controversy imposes an unlawful burden on interstate commerce; (2) it violates the freedom of speech and publication guaranteed by § 11, art. 1, of the constitution of the State of Ohio; [1] and (3) it attempts to delegate legislative power to censors and to other boards to determine whether the statute offends in the particulars designated.

It is necessary to consider only §§ 3, 4 and 5. Section 3 makes it the duty of the board to examine and censor motion picture films to be publicly exhibited and displayed

---

[1] "Section 11. Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."

in the State of Ohio.  The films are required to be exhibited
to the board before they are delivered to the exhibitor
for exhibition, for which a fee is charged.

Section 4.  "Only such films as are in the judgment and
discretion of the board of censors of a moral, educational or
amusing and harmless character shall be passed and ap-
proved by such board."  The films are required to be
stamped or designated in a proper manner.

Section 5.  The board may work in conjunction with
censor boards of other States as a censor congress, and
the action of such congress in approving or rejecting films
shall be considered as the action of the state board, and all
films passed, approved, stamped and numbered by such
congress, when the fees therefor are paid shall be consid-
ered approved by the board.

By § 7 a penalty is imposed for each exhibition of films
without the approval of the board, and by § 8 any person
dissatisfied with the order of the board is given the same
rights and remedies for hearing and reviewing, amendment
or vacation of the order "as is provided in the case of per-
sons dissatisfied with the orders of the industrial com-
mission."

The censorship, therefore, is only of films intended for
exhibition in Ohio, and we can immediately put to one
side the contention that it imposes a burden on interstate
commerce.  It is true that according to the allegations
of the bill some of the films of complainant are shipped
from Detroit, Michigan, but they are distributed to ex-
hibitors, purchasers, renters and lessors in Ohio, for ex-
hibition in Ohio, and this determines the application of
the statute.  In other words, it is only films which are "to
be publicly exhibited and displayed in the State of Ohio"
which are required to be examined and censored.  It would
be straining the doctrine of original packages to say that
the films retain that form and composition even when un-
rolling and exhibiting to audiences, or, being ready for

renting for the purpose of exhibition within the State, could not be disclosed to the state officers. If this be so, whatever the power of the State to prevent the exhibition of films not approved—and for the purpose of this contention we must assume the power is otherwise plenary—films brought from another State, and only because so brought, would be exempt from the power, and films made in the State would be subject to it. There must be some time when the films are subject to the law of the State, and necessarily when they are in the hands of the exchanges ready to be rented to exhibitors or have passed to the latter, they are in consumption, and mingled as much as from their nature they can be with other property of the State.

It is true that the statute requires them to be submitted to the board before they are delivered to the exhibitor, but we have seen that the films are shipped to "exchanges" and by them rented to exhibitors, and the "exchanges" are described as "nothing more or less than circulating libraries or clearing houses." And one film "serves in many theatres from day to day until it is worn out.".

The next contention is that the statute violates the freedom of speech and publication guaranteed by the Ohio constitution. In its discussion counsel have gone into a very elaborate description of moving picture exhibitions and their many useful purposes as graphic expressions of opinion and sentiments, as exponents of policies, as teachers of science and history, as useful, interesting, amusing, educational and moral. And a list of the "campaigns," as counsel call them, which may be carried on is given. We may concede the praise. It is not questioned by the Ohio statute and under its comprehensive description, "campaigns" of an infinite variety may be conducted. Films of a "moral, educational or amusing and harmless character shall be passed and approved" are the words of the statute. No exhibition, therefore, or "campaign"

of complainant will be prevented if its pictures have those qualities. Therefore, however missionary of opinion films are or may become, however educational or entertaining, there is no impediment to their value or effect in the Ohio statute. But they may be used for evil, and against that possibility the statute was enacted. Their power of amusement and, it may be, education, the audiences they assemble, not of women alone nor of men alone, but together, not of adults only, but of children, make them the more insidious in corruption by a pretense of worthy purpose or if they should degenerate from worthy purpose. Indeed, we may go beyond that possibility. They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a prurient interest may be excited and appealed to. Besides, there are some things which should not have pictorial representation in public places and to all audiences. And not only the State of Ohio but other States have considered it to be in the interest of the public morals and welfare to supervise moving picture exhibitions. We would have to shut our eyes to the facts of the world to regard the precaution unreasonable or the legislation to effect it a mere wanton interference with personal liberty.

We do not understand that a possibility of an evil employment of films is denied, but a freedom from the censorship of the law and a precedent right of exhibition are asserted, subsequent responsibility only, it is contended, being incurred for abuse. In other words, as we have seen, the constitution of Ohio is invoked and an exhibition of films is assimilated to the freedom of speech, writing and publication assured by that instrument and for the abuse of which only is there responsibility, and, it is insisted, that as no law may be passed "to restrain the liberty of speech or of the press," no law may be passed to subject moving pictures to censorship before their exhibition.

We need not pause to dilate upon the freedom of opinion and its expression, and whether by speech, writing or printing. They are too certain to need discussion—of such conceded value as to need no supporting praise. Nor can there be any 'doubt of their breadth nor that their underlying safeguard is, to use the words of another, "that opinion is free and that conduct alone is amenable to the law."

Are moving pictures within the principle, as it is contended they are? They, indeed, may be mediums of thought, but so are many things. So is the theatre, the circus, and all other shows and spectacles; and their performances may be thus brought by the like reasoning under the same immunity from repression or supervision as the public press,—made the same agencies of civil liberty.

Counsel have not shrunk from this extension of their contention and cite a case in this court where the title of drama was accorded to pantomime; [1] and such and other spectacles are said by counsel to be publications of ideas, satisfying the definition of the dictionaries,—that is, and we quote counsel, a means of making or announcing publicly something that otherwise might have remained private or unknown,—and this being peculiarly the purpose and effect of moving pictures they come directly, it is contended, under the protection of the Ohio constitution.

The first impulse of the mind is to reject the contention. We immediately feel that the argument is wrong or strained which extends the guaranties of free opinion and speech to the multitudinous shows which are advertised on the bill-boards of our cities and towns and which regards them as emblems of public safety, to use the words of Lord Camden, quoted by counsel, and which seeks to

---

[1] *Kalem* v. *Harper Bros.,* 222 U. S. 55.

bring motion pictures and other spectacles into practical and legal similitude to a free press and liberty of opinion.

The judicial sense supporting the common sense of the country is against the contention. As pointed out by the District Court, the police power is familiarly exercised in granting or withholding licenses for theatrical performances as a means of their regulation. The court cited the following cases: *Marmet* v. *State*, 45 Ohio, 63, 72, 73; *Baker* v. *Cincinnati*, 11 Ohio St. 534; *Commonwealth* v. *McGann*, 213 Massachusetts, 213, 215; *People* v. *Steele*, 231 Illinois, 340, 344, 345.

The exercise of the power upon moving picture exhibitions has been sustained. *Greenberg* v. *Western Turf Ass'n*, 148 California, 126; *Laurelle* v. *Bush*, 17 Cal. App. 409; *State* v. *Loden*, 117 Maryland, 373; *Block* v. *Chicago*, 239 Illinois, 251; *Higgins* v. *Lacroix*, 119 Minnesota, 145. See also *State* v. *Morris*, 76 Atl. Rep. 479; *People* v. *Gaynor*, 137 N. Y. S. 196, 199; *McKenzie* v. *McClellan*, 116 N. Y. S. 645, 646.

It seems not to have occurred to anybody in the cited cases that freedom of opinion was repressed in the exertion of the power which was illustrated. The rights of property were only considered as involved. It cannot be put out of view that the exhibition of moving pictures is a business pure and simple, originated and conducted for profit, like other spectacles, not to be regarded, nor intended to be regarded by the Ohio constitution, we think, as part of the press of the country or as organs of public opinion. They are mere representations of events, of ideas and sentiments published and known, vivid, useful and entertaining no doubt, but, as we have said, capable of evil, having power for it, the greater because of their attractiveness and manner of exhibition. It was this capability and power, and it may be in experience of them, that induced the State of Ohio, in addition to prescribing penalties for immoral exhibitions, as it does in its Criminal

Code, to require censorship before exhibition, as it does by the act under review.  We cannot regard this as beyond the power of government.

It does not militate against the strength of these considerations that motion pictures may be used to amuse and instruct in other places than theatres—in churches, for instance, and in Sunday schools and public schools.  Nor are we called upon to say on this record whether such exceptions would be within the provisions of the statute nor to anticipate that it will be so declared by the state courts or so enforced by the state officers.

The next contention of complainant is that the Ohio statute is a delegation of legislative power and void for that if not for the other reasons charged against it, which we have discussed.  While administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words.  It is best recognized in illustrations.  Undoubtedly the legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply.  If this could not be done there would be infinite confusion in the laws, and in an effort to detail and to particularize, they would miss sufficiency both in provision and execution.

The objection to the statute is that it furnishes no standard of what is educational, moral, amusing or harmless, and hence leaves decision to arbitrary judgment, whim and caprice; or, aside from those extremes, leaving it to the different views which might be entertained of the effect of the pictures, permitting the "personal equation" to enter, resulting "in unjust discrimination against some propagandist film," while others might be approved without question.  But the statute by its provisions guards against such variant judgments, and its terms, like other

general terms, get precision from the sense and experience of men and become certain and useful guides in reasoning and conduct. The exact specification of the instances of their application would be as impossible as the attempt would be futile. Upon such sense and experience, therefore, the law properly relies. This has many analogies and direct examples in cases, and we may cite *Gundling* v. *Chicago*, 177 U. S. 183; *Red "C" Oil Manufacturing Co.* v. *North Carolina*, 222 U. S. 380; *Bridge Co.* v. *United States*, 216 U. S. 177; *Buttfield* v. *Stranahan*, 192 U. S. 470. See also *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86. If this were not so, the many administrative agencies created by the state and National governments would be denuded of their utility and government in some of its most important exercises become impossible.

To sustain the attack upon the statute as a delegation of legislative power, complainant cites *Harmon* v. *State*, 66 Ohio St. 249. In that case a statute of the State committing to a certain officer the duty of issuing a license to one desiring to act as an engineer if "found trustworthy and competent," was declared invalid because, as the court said, no standard was furnished by the General Assembly as to qualification, and no specification as to wherein the applicant should be trustworthy and competent, but all was "left to the opinion, finding and caprice of the examiner." The case can be distinguished. Besides, later cases have recognized the difficulty of exact separation of the powers of government, and announced the principle that legislative power is completely exercised where the law "is perfect, final and decisive in all of its parts, and the discretion given only relates to its execution." Cases are cited in illustration. And the principle finds further illustration in the decisions of the courts of lesser authority but which exhibit the juridical sense of the State as to the delegation of powers.

Section 5 of the statute, which provides for a censor

congress of the censor board and the boards of other States, is referred to in emphasis of complainant's objection that the statute delegates legislative power.  But, as complainant says, such congress is "at present nonexistent and nebulous," and we are, therefore, not called upon to anticipate its action or pass upon the validity of § 5.

We may close this topic with a quotation of the very apt comment of the District Court upon the statute. After remarking that the language of the statute "might have been extended by descriptive and illustrative words," but doubting that it would have been the more intelligible and that probably by being more restrictive might be more easily thwarted, the court said: "In view of the range of subjects which complainants claim to have already compassed, not to speak of the natural development that will ensue, it would be next to impossible to devise language that would be at once comprehensive and automatic."

In conclusion we may observe that the Ohio statute gives a review by the courts of the State of the decision of the board of censors.

*Decree affirmed.*