## RD–DR CORPORATION et al. v. SMITH et al.
### No. 13205.

United States Court of Appeals
Fifth Circuit.
July 14, 1950.

Writ of Certiorari Denied Oct. 16, 1950.
See 71 S.Ct. 80.

Ambrose Doskow, New York City, Morris B. Abram, Atlanta, Ga., for appellant.

J. M. B. Bloodworth, John E. Feagin, J. C. Savage, J. C. Murphy, and Henry L. Bowden, Asst. City Atty., all of Atlanta, Ga., for appellees.

Before HUTCHESON, Chief Judge, and McCORD and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Plaintiffs, two corporations engaged, one in the business of producing, the other in the business of distributing, motion pictures, brought this suit to restrain the enforcement of the provisions of the code and censorship ordinance of the City of Atlanta, and for a judgment declaring its provisions unconstitutional and void.

The claim was not narrowly based upon the particular terms of the particular ordinance, the particular manner of its enforcement, or the particular motion picture subjected to censorship. It was based broadly upon the claim that, under the due process clause of the Fourteenth Amendment, as extended in recent decisions of the Supreme Court to include freedom of speech, of the press and of assembly,[1] "motion pictures are a medium of communication, entitled as part of the press," to complete freedom and protection from censorship by any state or political subdivision.

Defendants moved to dismiss the complaint on the authority of Mutual Film Corp. v. Ohio Indemnity Co., 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, holding that "the exhibition of moving pictures is a

[1]. Beginning with Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, and including Grosjean v. American Press Co., 297 U.S. 233, 56 S. Ct. 444, 80 L.Ed. 660; Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608; Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131.

business pure and simple, originated and conducted for profit like other spectacles and not to be regarded as the press of the country, or as organs of public opinion within the constitutional meaning of freedom of speech and publication". Their motion was sustained, the complaint was dismissed, and plaintiffs have appealed.

Here they admit that the judgment finds support in the cited case and that unless it is disregarded by us as no longer authoritative, the judgment must be affirmed. They urge upon us, however, that in the present state of the decisions expanding "the first amendment rights as limitations upon the states and advancing them to a preferred position in our constitutional scheme", it must be taken for granted by us that, given an opportunity to do so, at least a majority of the Supreme Court, as now constituted, will overrule it, and we should, therefore, give it the anticipatory *coup de grace.*

Proceeding on the apparent assumption that this court is, or ought to be, in agreement with appellant's view that the decision was, and is, erroneous, and that it, therefore, ought to, and will be, overruled, appellants' arguments tend to beg the question, fall short in convincing exposition.

Considered each by itself and as a whole, the bits of evidence relied on by appellants to support their claim that the Supreme Court is prepared, by extending the 14th Amendment to include motion pictures, to nationalize the motion picture industry and thus remove it from state and local control, fall far short of doing so. Indeed, if, as appellants seem to contend, we must decide this appeal, not by determining for ourselves whether the Mutual Film case was correctly decided and, therefore, is still the law, but by shrewd guessing whether it will be able to muster a majority in the Supreme Court this would not avail them. For we think it plain that if anything can be said to have clearly emerged from the struggle to extend the Fourteenth Amendment as an instrument of nationalism by striking down all state regulatory power, it is, that whatever individual judges may say in dissent, the court, as now constituted, will not overrule, or in any manner depart from, the holding in the Mutual Film Corporation case but will fully reaffirm it.

It will serve no useful purpose for us here to review at any length the efforts, begun by the dissenters in Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223,[2] and apparently still continuing, to

2. It will be sufficient for us to refer to the scholarly pamphlet, "Does the Fourteenth Amendment incorporate the Bill of Rights?"—'The Original Understanding' by Charles Fairman; 'The Judicial Interpretation', by Stanley Morrison—Stanford Law Review, Vol. II, No. 1, Dec. 1949, and its completely convincing answer in the negative; and to point to the fact that, while Justices Black and Jackson disagree on the Black thesis that the Fourteenth Amendment made the Federal Bill of Rights applicable to the states, both agree that, in declaring that the rights dealt with in the First Amendment are also protected by the Fourteenth Amendment, the Supreme Court has in effect raised itself by its own bootstraps into a most unstable empyrean.

Mr. Justice Black, dissenting in the Adamson case, thus states his view:

"I fear to see the consequences of the Court's practice of substituting its own concepts of decency and fundamental justice for the language of the Bill of Rights

as its point of departure in interpreting and enforcing that Bill of Rights. * * To hold that this Court can determine what, if any, provisions of the Bill of Rights will be enforced, and if so to what degree, is to frustrate the great design of a written Constitution." [322 U.S. 46, 67 S.Ct. 1695, 91 L.Ed. 1903, 171 A.L.R. 1223].

Mr. Justice Jackson, in his bold and vigorous dissent in Terminiello v. Chicago (note 1, supra), after deploring the action of the majority in using the Fourteenth Amendment to strike down state power to punish one who provokes, or participates in, public riots, states his position thus:

"Before giving the First and Fourteenth Amendments to the Constitution this effect, we should recall that our application of the First Amendment to Illinois rests entirely on authority which this Court has voted to itself. * * * *" 337 U.S. 28, 69 S.Ct. at page 906, 93 L. Ed. 1131.

import the Bill of Rights into the Fourteenth Amendment. It is sufficient to point to the controversy and the divisions it has made, and is making, in the Supreme Court and to draw from it a conclusion exactly the opposite of the picture drawn by appellants.[3] Their picture is of a court ministering to the demand for national uniformity of view as to what should be done about moving pictures, and unfettered by prior decisions, ready to turn away in unison from the established doctrine of the right, the duty, and the power of the several states and their subdivisions, when not

"This absence from the Constitution of any expressed power to deal with abuse of freedom of speech has enabled the Court to soar aloof from any consideration of the abuses which create problems for the states and to indulge in denials of local authority, some of which seem to me improvident in the light of functions which local governments must be relied on to perform for our free society. * * " 337 U.S. p. 29–30, 69 S.Ct. at page 907, 93 L.Ed. 1131.

Then, after pointing to recent decisions which "have almost completely immunized this battle for the streets from any form of control", he goes on to say:

" * * * Whatever the merits of any one of these decisions in isolation, and there were sound reasons for some of them, it cannot be denied that their cumulative effect has been a sharp handicap on municipal control of the streets and a dramatic encouragement of those who would use them in a battle of ideologies.

"I do not think we should carry this handicap further, as we do today, but should adhere to the principles heretofore announced to safeguard our liberties against abuse as well as against invasion. * * * " 337 U.S. p. 30–31, 69 S.Ct. at page 908, 93 L.Ed. 1131.

3. Mr. Justice Frankfurter, concurring in Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608, clearly and with unassailable correctness, at once punctures the trial balloon of the unwarranted assumption that, in some way not known or knowable, except to those to whom the vision has appeared, the Fourteenth Amendment "has created" a "preferred position for freedom of speech", and that, of the claim that the Fourteenth Amendment incorporates the Bill of Rights. He says:

"My brother, Reed speaks of 'the preferred position of freedom of speech,' though, to be sure, he finds that the Trenton ordinance does not disregard it. This is a phrase that has uncritically crept into some recent opinions of this Court. I deem it a mischievous phrase, if it carries the thought, which it may subtly imply, that any law touching communications is infected with presumptive invalidity. It is not the first time in the history of constitutional adjudication that such a doctrinaire attitude has disregarded the admonition most to be observed in exercising the Court's reviewing power over legislation, 'that it is a constitution we are expounding,' M'Culloch v. State of Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579. * * * ". 336 U.S. at page 90, 69 S.Ct. at page 435, 93 L.Ed. 513, 10 A.L.R.2d 608.

"In short, the claim that any legislation is presumptively unconstitutional which touches the field of the First Amendment and the Fourteenth Amendment, insofar as the latter's concept of 'liberty' contains what is specifically protected by the First, has never commended itself to a majority of this Court." 336 U.S. at page 94–95, 69 S.Ct. at page 457, 93 L.Ed. 513, 10 A.L.R.2d 608.

While, in Wolf v. Colorado, 338 U.S. 25, at page 26, 69 S.Ct. 1359, 1360, 93 L.Ed. 1782, speaking for the majority, he gives this errant idea its final congé:

"Unlike the specific requirements and restrictions placed by the Bill of Rights, Amendments I to VIII, upon the administration of criminal justice by federal authority, the Fourteenth Amendment did not subject criminal justice in the States to specific limitations. The notion that the 'due process of law' guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution and thereby incorporates them has been rejected by this Court again and again, after impressive consideration. See e. g. Hurtado v. Calif., 110 U.S. 516, 4 S.Ct. 111, 292, 28 L. Ed. 232; Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Palko v. State of Conn., 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288. Only the other day the Court reaffirmed this rejection after thorough reexamination of the scope and function of the Due Process Clause of the Fourteenth Amendment. Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A. L.R. 1223. The issue is closed."

expressly forbidden by the Constitution, to hold differing views as to what is required in upholding and preserving their peace and dignity where motion pictures are concerned, and to enact and enforce necessary local laws.

■ We cannot agree with appellants that it is any part of our duty to consult crystal ball gazers or diviners or to do the gazing and divining for ourselves in order to base a decision on a prophesy. Our duty is in accordance with the long settled and still controlling principles of judicial decision, despite vigorously announced views of individual judges to the contrary, to determine not how, if we were legislators we would write the law, but how, in accordance with the principles governing judicial decision, including Stare Decisis, and the adjudicated cases, which make up the law, it must be written.

■ Coming then to the decision of this case, in that spirit, and guided by those principles, we are in no doubt that the law was correctly laid down in the opinion under attack and that the views there expressed ought not to be receded from.

Further, while we are prepared to concede to appellants that one or more of the judges may be found to be in agreement with them, we find nothing in the stream of tendency in the opinions of courts of last resort, state and federal, taken singly and as a whole, which at all supports the view broadly announced here, that the Fourteenth Amendment paralyzes all state supervisory control of moving picture exhibitions.

We particularly disagree with, and dissent from, the view they thus in substance advance: that moving pictures have now emerged from the business of amusement into instruments for the propagation of ideas and, therefore, like newspapers, freedom of assembly, freedom of speech, must be regarded as within the protection of the Fourteenth Amendment; that censorship of moving pictures by states or local communities is contrary to the new enlightenment and the trend of the new national opinion; and that the Mutual Film decision, standing in the way is now antiquated and tottering to its fall, and should be decently and finally interred.

■ The decision has been on the books for years, not only unchanged but uncriticized. When written it was based on the settled views in, and the decisions of many of the, state courts. Since its writing, it has been quoted from and followed without varying in decisions without number. In such circumstances, something more compelling than the mere desire of a large and powerful industry to be free of local restraints, should be presented to induce a court to overrule and set it aside. For, no matter how much may be said in favor of judicious judicial flexibility of interpretation, it is still the law of state and federal courts that long standing decisions of the supreme court should not be set aside on the mere personal opinions of later judges, especially when such decisions have been in part induced, and for more than a generation have been in turn followed, by the decisions of the state courts of last resort of comparable standing and dignity.

Further, even if there had been no precise precedent, it would seem that a far more substantial reason than is here presented should be found for converting the Fourteenth Amendment into an instrument for the complete paralysis of the supervisory and regulatory powers of the states over the showing of motion pictures.

To put it still another way, it would seem that when appellants assert that a controlling precedent like this one should be overruled, on the ground that what the predecessors of the present court decided was not the Constitution but merely the gloss they had put on it, the question should be seriously put to them. "Who is putting the gloss on the Constitution? Is it the earlier judges who concluded, in the Mutual Film case, that exhibitions and spectacles like moving pictures are not protected by the Fourteenth Amendment from state supervisory control, or is it the present appellants who assert that they are?

■ To quote from Mr. Morrison's fine article, note 2, supra: "No matter how desirable the results might be, it is of the essence of our system that the judges must

stay within the bounds of their constitutional power. Nothing is more fundamental,— even the Bill of Rights. To depart from this fundamental is, in Mr. Justice Black's own words, 'to frustrate the great design of a written constitution.' "

The judgment below was right. It is affirmed.