Hast, J.
The plaintiff in case No. 33265 submits that the question presented is whether “motion pictures, as distinguished from other media of human expression, may be subjected to censorship in advance of publication; or, whether motion pictures, along with such other media, are entitled to protection from all restraint except such as is incident to responsibility for abuse.”
On the other hand, the defendant states his basic position as follows:
“The impact of the motion picture, the unrestricted audience, and the subject matter of those films which experience shows have been rejected, taken together present an area of proper interest for Ohio and an area which can be constitutionally regulated. The standards of regulation under this statute have acquired in this court and through administrative experience a definiteness which complies with procedural due process of law. The Division of Film Censorship acted reasonably and within the proper bounds of its discretion in rejecting the motion picture 'M.’ The question of the tax or license characteristics of the fee provided is regarded as a separate and collateral question. It is plainly a license fee though some surplus revenue has been produced. Irrespective of that, however, plaintiff voluntarily paid the fee and by all ordinary principles of law should be estopped from making his voluntary act the basis for a constitutional challenge. ’ ’
In 1913, the Ohio General Assembly adoted a motion picture censorship act providing for a Board of *320 Censors to operate under the authority and supervision of the Industrial Commission. Section 871-48, General Code, a part of the act, provided that “it shall be the duty of the Board of Censors to examine and censor as herein provided, of motion picture films to be publicly exhibited and displayed in the state of Ohio.”
Section 871-49 provided that “only such films as are in the judgment and discretion of the Board of Censors of a moral, educational or amusing and harmless character shall be passed and approved by such board.”
In 1935, the censorship body was designated as the “Division of Film Censorship of the Department of Education” (116 Ohio Laws, 100). In 1943, Section 871-48, General Code, became present Section 154-47, General Code, and Section 871-49, General Code, became present Section 154-47&, General Code (120 Ohio Laws, 481), but the language of the statutes as above quoted has remained practically the same.
In 1914, the constitutionality of the Ohio censorship act, as above noted, was under consideration by the Supreme Court of the United States in the case of Mutual Film Corp. v. Industrial Commission of Ohio, 236 U. S., 230, 59 L. Ed., 552, 35 S. Ct., 387, Ann. Cas. 1916C, 296.
In that case the act was attacked from three standpoints as follows: (1) That the act was in violation of Sections 5,16 and 19 of Article I of the Constitution of Ohio in that it deprived an applicant of due process of law by placing in the board of censors the power to determine from standards fixed by itself what films conformed to the statute; (2) that the act was in violation of Articles I and XIV of the Amendments to the Constitution of the United States, and of Section 11 of Article I of the Constitution of Ohio, in that it restrained applicant and other persons from freely *321 writing and publishing their sentiments; and (3) that the act attempted to give the board of censors legislative power, which is vested only in the General Assembly, in that it gave to the board the power to apply the act without fixing any standard by which the board should be guided in its determination.
The court there held legislative power is not delegated and the freedom of speech and publication guaranteed by Section 11, Article I of the Ohio Constitution, is not violated by the provisions of Sections 154-47 to 154-47Í, inclusive, General Code, creating a board of censors which is required to examine and censor prior to exhibition motion picture films intended to be publicly exhibited and displayed in the state, and to pass and approve only such films as are, in its judgment, of a moral, educational, or amusing and harmless character.
In that case Justice McKenna said:
“* * * Films of a ‘moral, educational or amusing and harmless character shall be passed and approved’ are the words of the statute. No exhibition, therefore, or ‘campaign’ of complainant will be prevented if its pictures have those qualities. Therefore, however missionary of opinion films are or may become, however educational or entertaining, there is no impediment to their value or effect in the Ohio statute. But they may be used for evil, and against that possibility the statute was enacted. Their power of amusement and, it may be, education, the audiences they assemble, not of women alone nor of men alone, but together, not of adults only, but of children, make them the more insidious in corruption by a pretense of worthy purpose or if they should degenerate from worthy purpose. Indeed, we may go beyond that possibility. They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a *322 prurient interest may be excited and appealed to. Besides, there are some things which should not have pictorial representation in public places and to all audiences. And not only the state of Ohio but other states have considered it to be in the interest of the public morals and welfare to supervise moving picture exhibitions. We would have to shut our eyes to the facts of the world to regard the precaution unreasonable or the legislation to effect it a mere wanton interference with personal liberty.
6 i # # #
“* * * It cannot be put out of view that the exhibition of moving pictures is a business pure and simple, originated and conducted for profit, like other spectacles, not to be regarded, nor intended to be regarded by the Ohio Constitution, we think, as part of the press of the country or as organs of public opinion. They are mere representations of events, of ideas and sentiments published and known, vivid, useful and entertaining no doubt, but, as we have said, capable of evil, having power for it, the greater because of their attractiveness and manner of exhibition. It was this capability and power, and it may be in experience of them, that induced the state of Ohio, in addition to prescribing penalties for immoral exhibitions, as it does in its Criminal Code, to require censorship before exhibition, as it does by the act under review. We cannot regard this as beyond the power of government.”
The plaintiff asserts that the free speech and press guaranty of the First Amendment to the Constitution of the United States is secured from infringement by the state by the Fourteenth Amendment to that Constitution, and that the guaranties of Sections 2 and 11, Article I of the Constitution of Ohio, are coextensive therewith (Joseph Burstyn, Inc., v. Wilson, Commr., 343 U. S., 495, 500, 96 L. Ed., 1098, 72 S. Ct., 777; *323 Direct Plumbing Supply Co. v. City of Dayton, 138 Ohio St., 540, 38 N. E. [2d], 70, 137 A. L. R., 1058); and that motion pictures are a mode of expression entitled to the same protection as “speech” and “the press” (Burstyn, Inc., v. Wilson, Commr., supra; Gelling v. Texas, 343 U. S., 960, 96 L. Ed., 1359, 72 S. Ct., 1002; United States v. Paramount Pictures, Inc., 334 U. S., 131, 166, 92 L. Ed., 1260, 1297, 68 S. Ct., 915). Upon that premise plaintiff then contends that Sections 154-47 to 154-47i, inclusive, General Code, are an unconstitutional prior restraint upon the exhibition of motion pictures equivalent to prior restraint upon freedom of speech and the press.
Chief reliance in support of plaintiff’s position is placed upon the recent pronouncement of the Supreme Court of the United States in the case of Burstyn, Inc., v. Wilson, Commr., supra, decided May 26, 1952, in which was reversed the judgment of the Court of Appeals of New York (303 N. Y., 242, 101 N. E. [2d], 665). In that case a license for the exhibition of a motion picture entitled “The Miracle” was rescinded by the appropriate New York authorities on the ground that the picture was “sacrilegious” within the meaning of the statute requiring the denial of a license if a film is “obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime.” The statute was upheld by the New York state courts but the United States Supreme Court reversed by a unanimous decision. The court based its reversal solely on the ground that the New York statute is an “unconstitutional abridgement of free speech and a free press.”
The court in that case, after reviewing an Ohio motion picture case decided by it almost 40 years ago (Mutual Film Corp. v. Industrial Commission of Ohio, supra), said;
*324 “In a series of decisions beginning with Gitlow v. New York, 268 U. S., 652 (1925) [and including Stromberg v. California, 283 U. S., 359, 368; Near v. Minnesota, ex rel. Alson, 283 U. S., 697, 707; Grosjean v. American Press Co., 297 U. S., 233, 244; DeJonge v. Oregon, 299 U. S., 353, 364; Lovell v. Griffin, 303 U. S., 444, 450; Schneider v. State, 308 U. S., 147, 160], this court held that the liberty of speech and of the press which the First Amendment guarantees against abridgement by the federal government is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action. That principle has been followed and reaffirmed to the present day. Since this series of decisions came after the Mutual decision, the present case is the first to present squarely to us the question whether motion pictures are within the ambit of protection which the First Amendment, through the Fourteenth, secures to any form of ‘speech’ or ‘the press.’ ”
Further excerpts from the opinion reveal the points stressed and the attitude of the court on the whole subject.
The court continued:
“It is further urged that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression. Even if one were to accept this hypothesis, it does not follow that motion pictures should be disqualified from First Amendment protection. If there be capacity for evil it may be relevant in determining the permissible scope of community control, but it does not authorize substantially unbridled censorship such as we have here.
“For the foregoing reasons, we conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments. To the extent that *325 language in the opinion in Mutual Film Corp. v. Industrial Commission, supra, is out of harmony with the views here set forth, we no longer adhere to it.” See United States v. Paramount Pictures, Inc., 334 U. S., 131, 166, 92 L. Ed., 1260, 1297, 68 S. Ct., 915.
The court further said:
“To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. That much is evident from the series of decisions of this court with respect to other media of communication o£ ideas [citing Feiner v. New York, 340 U. S., 315; Kovacs v. Cooper, 336 U. S., 77; Chaplinsky v. New Hampshire, 315 U. S., 568; Cox v. New Hampshire, 312 U. S., 569]. Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems. But the basic principles of freedom of speech and the press, like the First Amendment’s command, do not vary. Those principles, as they have frequently been enunciated by this court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule.
“# # * It wag father stated [in Near v. Minnesota, ex rel. Alson, County Atty., supra] that ‘the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.’ Id., at 716. In the light of the First Amendment’s history and of the Near decision, the state has a heavy burden to demonstrate that the limitation challenged here presents such an exceptional case.”
*326 The court then discussed as follows the character of the New York statute and its application:
“In seeking to apply the broad and all-inclusive definition of ‘sacrilegious’ given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies. New York cannot vest such unlimited restraining control over motion pictures in a censor. Cf. Kunz v. New York, 340 U. S., 290 (1951). Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be subject to an inevitable tendency to ban the expression of unpopular sentiments sacred to a religious minority. * * *
“Since the term ‘sacrilegious’ is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us.”
It will be noted that in the Near case the Supreme Court stated that “the primary requirements of decency may be enforced against obscene publication,” and in the case of Chaplinsky v. New Hampshire, 315 U. S., 568, 571, 86 L. Ed., 1031, 1034, 62 S. Ct., 766, Justice Murphy, speaking for a unanimous court, said: “There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.”
*327 In the case of Commercial Pictures Corp. v. Regents of University of New York, 114 N. Y. Snpp. (2d), 561, decided since the Burstyn case, the court sustained the order of the Regents of the University of New York refusing to license for exhibition a picture film entitled “LaRonde,” in connection with which the court, referring to the Burstyn case, said:
“We have no doubt, however, both from the area that was expressly left open in that case by the Supreme Court and from the generally accepted power of a state to deal by its municipal law with matters deemed offensive to public morals that the statute delegating the power of licensing to the Regents remains valid to that extent in a proper case.’V
The summary of Ohio law on the subject as expressed in 8 Ohio Jurisprudence, 468, Section 342, is as follows:
“Liberty of speech, then, is not license to speak anything that one pleases freed from all criminal or civil responsibility. And liberty of press does not extend to the privilege of publishing and disseminating baneful and harmful matter, or of inciting the people to violate laws. The police power, of course, constitutes a legitimate qualification of freedom of speech and press. Certainly this constitutional guaranty does not deprive the state of its power to enact laws for the protection of the public health, morals, safety, and welfare. Accordingly, motion picture censorship has been sustained.”
From these expressions of the United States Supreme Court and otherwise, we conclude that, although a motion picture film may not be rejected because of “sacrilegious” expressions or portrayals, there still remains a limited field in which decency and morals may be protected from the impact of an offending motion picture film by prior restraint under proper criteria. There can be no inherent right to publicity *328 -which tends to destroy the very social fabric of the community, and consequently in such instances there is no right of free speech or free press to be infringed. In these times of alarming rise in juvenile delinquency and of increasing criminality in this country, attributed by social agencies, at least in part, to the character of the exhibitions put on in the show houses of the country, criminal prosecution after the fact is a weak and ineffective remedy to meet the problem at hand. In the war against crime and delinquency there must be some effective defensive weapons against immoral publicity, whereby the social fabric may be protected as it is by law from other methods of attack. The chief problem with reference to publicity by exhibition is to protect that which is of such character as to invest its publisher with a right to publish, and at the same time restrain publicity as to which no such right exists;
As we view it, the United States Supreme Court has not ipso facto taken away all community control of moving pictures by censorship, and this court will not do so under the claim of complete unconstitutionality of censorship laws.
The motion picture, “M,” as shown by the certificate was rejected for the following reasons, among others:
“1. There is a conviction that the effect of this picture on unstable persons of any age level could lead to a serious increase in immorality and crime.
“2.- Presentation of actions and emotions of child killer emphasizing complete perversion without serving any valid educational purpose. Treatment of perversion creates sympathy rather than a constructive plan for dealing with perversion.”
The plaintiff claims that the division abused its discretion in rejecting the motion picture in question and in refusing to grant its approval for exhibition. *329 This court has before it only the script and general description of the content and character of the film as given in the respective briefs of the parties.
The plaintiff claims that the picture is artistic, free from vulgarity and immorality; that its purpose is “to so impress its viewers with the consequences of neglect and apathy that affirmatively moral and righteous attitudes toward the problems dramatized will result”; that it is educational because “it reveals to its audience the sources of five significant contemporary social problems, and then, either proposes a solution, or appeals for public understanding and action”; and that it is not harmful.
The defendant describes the picture as follows:
“This motion picture is filled with brutal crime. Two cold blooded murders are presented, another implied and a third attempted. A schizophrenic killer is treated with sympathy and an underworld boss is depicted as vastly more efficient than the police. Twice, the methods for abducting children on the streets are elaborated. ’ ’
Incidentally, stipulation eight shows that, for the period, January 1, 1943, to January 1, 1953, 17,741 motion picture films have been approved by the Division of Film Censorship and 59 rejected. Fifteen of the pictures so rejected were later approved, leaving-44 remaining unlicensed.
It is apparent that the lofty purposes of the picture, as expressed by its producers, would appeal only to a limited number of its viewers, whereas the great majority of a promiscuous audience, including children, would be impressed and affected merely by the exhibitionism and the portrayal of evil conduct in society, which the producers admit is so bad as to need radical correction.
The plaintiff claims also that Sections 154-47 to 154-47i, inclusive, General Code, which authorize a *330 prior censorship and restraint, the criteria for acceptable pictures being that they be of a “moral, educational or amusing and harmless character,” are by their language and as applied to the plaintiff indefinite, vague and incompatible with and repugnant to the First and Fourteenth Amendments to the Constitution of the United States and Sections 2 and 11, Article I of the Constitution of Ohio.
Plaintiff does not complain so much of the criteria established for the approval of films but attacks the requirement of censorship generally on the ground that such approval must be given before any film may be exhibited. The criteria by which films shall be judged under the terms of the statute could doubtless have been made more definite, but where such criteria, expressed in the reverse form, excludes, as it does, only such films as are “immoral,” “noneducational” or “nonamusing,” or, adding the word, “harmful,” as are “immoral and harmful,” “noneducational and harmful,” or “nonamusing and harmful,” the tests are sufficiently definite. No film which has a right to public exhibition can be excluded or rejected. In our opinion, the statutory tests provided may be applied without great difficulty. In this connection, it is interesting to note that the criminal statute of the state defining the felony of exhibiting a picture of “an indecent or immoral nature” is no more definite and certain in terms. Section 13035, General Code, provides:
“Whoever knowingly * * * exhibits * * * motion picture film * * * of an indecent or immoral nature * * * shall be fined not less than two hundred dollars nor more than two thousand dollars or imprisoned not more than seven years, or both.”
Again, Section 13040, General Code, defining the felony of owning and operating a picture machine to exhibit certain types of pictures is as follows:
*331 “Whoever * * * owns or operates * * * a picture machine or other device exhibiting a lascivious, indecent, immoral or impure picture or figure or a picture of crime or lust, or a picture tending to corrupt morals, shall be fined not less than fifty dollars nor more than five hundred dollars, and for each subsequent offense, in addition to such fine, shall be imprisoned not less than thirty days nor more than six months. ’ ’
In those statutes the definitions of the crimes were made sufficiently clear in order to give notice of the exact limits of the forbidden act to a possible offender. This is not necessarily true as to the test in the approval or disapproval of a picture film. The criteria by which a picture film may be approved or rejected must be sufficiently definite to enable a reviewing court to properly review the determination of the administrative body passing upon the character of the picture film. See the opinion of Mr. Justice Frankfurter in Burstyn v. Wilson, Commr., supra, 532. Plaintiff in this case inferentially accedes to this test by seeking to have this court, as an alternative, review the record and set aside the order of rejection based upon the character and merits of the picture film, and this court has had several occasions to exercise such review. Epoch Producing Corp. v. Riegel, Dir., 113 Ohio St., 697, 150 N. E., 756, and Hallmark Productions, Inc., v. Dept. of Education, Division of Film Censorship, 153 Ohio St., 595, 93 N. E. (2d), 13.
We submit that the definitions of the crimes above referred to are no more certain and definite than the criteria in the motion picture censorship code, and that the judge or jury in determining whether there was a violation of those criminal statutes would be required to exercise the same scope of judgment as would the division in the approval or disapproval of a picture film. Besides, if discretion is abused, ample *332 provision is made to correct the mistake on judicial review. Furthermore, the tests of the censorship statute have over a period of over 40 years acquired a definite and circumscribed meaning.
As stated in defendant’s brief, “the standards have enjoined the obscene, the immoral, and that which tended to promote crime or riot, judged in relation to the impact and the audience. The experience of the past decade indicates that not one of the forty-four films rejected fell outside of that test. It is especially pertinent to observe that of the ten outstanding films pointed to by plaintiff as examples of films dealing with questions of great public importance, each has been licensed and exhibited throughout Ohio. This but demonstrates the value of the licensing system. The controversial problems of ‘Pinky’ may have free access to the minds of Ohio’s adults and children; the obscenity of ‘Sinful Love,’ the immorality of ‘My Last Mistress,’ the dangerous criminal aspects of ‘Apology for Murder’ and ‘M’ may not.”
The criteria and standards of the Ohio statute have had the attention of the United States Supreme Court wherein their definiteness has been recognized. In Mutual Film Corp. v. Industrial Commission, supra, the court held that the criteria of the statute did leave decision to arbitrary judgment, but were deemed to have acquired precision from the judgment and experience of administrators. It is to be observed that the holding of the court on this branch in the Mutual case was not overruled or criticised in the Burstyn case. In fact, in that case Mr. Justice Frankfurter, with whom Mr. Justice Burton and Mr. Justice Jackson joined in striking down the term, “sacrilegious,” contrasted that indefinite term with the standards of the Ohio act in these words:
“* * * Even in Mutual Film Corp. v. Ohio Industrial Comm’n * * * it was deemed necessary to find that the *333 terms ‘educational, moral, amusing or harmless’ do not leave ‘decision to arbitrary judgment.’ Such general words were found to ‘get precision from the sense and experience of men.’ * * * This cannot be said of ‘sacrilegious.’ If there is one thing that the history of religious conflicts shows, it is that the term ‘sacrilegious’ — if by that is implied offense to the deep convictions of members of different sects, which is what the Court of Appeals seems to mean so far as it means anything precisely — does not gain ‘precision from the sense and experience of men.’
“* * * Well equipped law libraries are not niggardly in their reflection of ‘the sense and experience of men,’ but we must search elsewhere for any which gives to ‘sacrilege’ its meaning.” See, also, Winters v. New York, 333 U. S., 507, 518, 92 L. Ed., 840, 68 S. Ct., 665; Omaechevarria v. State of Idaho, 246 U. S., 343, 62 L. Ed., 763, 38 S. Ct., 323; Waters-Pierce Oil Co. v. State of Texas, 212 U. S., 86, 53 L. Ed., 417, 29 S. Ct., 220; Gorin v. United States, 312 U. S., 19, 85 L. Ed., 488, 61 S. Ct., 429.
Our attention is called to the ease of Gelling v. State of Texas, supra, as being decisive of the instant cases. As disclosed by the per curiam, opinion in that case, it was decided on authority of Joseph Burstyn, Inc., v. Wilson, Commr., supra, and Winters v. New York, supra, without further statement or reason.
We have already considered the Burstyn case. In the Winters case, a New York statute made it an offense to publish and distribute publications “principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime.” In an opinion by Mr. Justice Heed, concurred in by five members of the court, it was held that the statute did not set up a sufficiently definite standard of conduct. Mr. Justice Frankfurter, with the concurrence of Mr. Justice Jack *334 son and Mr. Justice Burton, dissented on the ground that the statute made incitement to crime an offense and for that purpose was sufficiently definite, even though one desiring to avoid violation of the law might be mistaken in attempting to guess the jury’s appraisal of the effect of the publication.
In the Gelling case, above noted, the appellant was convicted under an ordinance of the city of Marshall, Texas, for exhibiting a picture after being denied a license to do so. The ordinance authorized the licensing board to deny a license to show a motion picture which, in its opinion, was “of such character as to be prejudicial to the best interests of the people of said city.” Mr. Justice Frankfurter, concurring in the judgment of reversal, said: “This ordinance offends the due process clause of the Fourteenth Amendment on the score of indefiniteness.” This reason for invalidity carries with it the implication that under a proper statute motion pictures may be subjected to reasonable censorship. Conceding that the Marshall ordinance was void for indefiniteness, it does not suggest that the criteria of our licensing statute are insufficient or that it should be stricken down for that reason.
Lastly, plaintiff claims that the fees for the censorship of moving picture films under the statute in question, calculated at the rate of $3 per 1,000 lineal feet of film or portions thereof, are not license fees but an excise tax and therefore discriminatory and unlawful because these fees are in excess of the necessary cost in making the inspection. The record discloses that the fees paid from January 1, 1943, to June 30, 1952, amounted to $2,229,960.59, whereas the operating cost of the division for the same period was a total of $334,364.56, the balance being distributed to the General Revenue Fund of the state and the visual educational rotary fund as provided by statute. *335 It should be observed, however, that the cost of operation of the division does not reflect other heavy governmental and facility costs incidental to the- operation of the division. The state is obliged to furnish housing and other facilities as well as the service of the legislative and judicial branches of the state government in carrying on the license system, the cost of all of which is outside the operational cost of the division. See Globe Security & Loan Co. v. Carrel, Aud., 106 Ohio St., 43, 48, 138 N. E., 364.
Besides the plaintiff paid the fee for inspection without protest and does not seek its recovery. Neither has it enjoined the levy of the fee as it could do, if it were illegal under the provisions of Section 12075, General Code. Under such circumstances, the plaintiff is estopped in this action to complain on this point. King v. Cappellar, 42 Ohio St., 218; Wilson v. Pelton, 40 Ohio St., 306; State, ex rel. Pulskamp, v. Board of County Commrs., 119 Ohio St., 504, 164 N. E., 755; State, on Application of Alter, v. Bader et al., Commrs., 56 Ohio St., 718, 47 N. E., 564.
From the evidence before this court we cannot say that the defendant abused his discretion in refusing to approve the picture film in question. The division, representing the public interest, has made its decision and this court cannot find affirmatively that it was in error in so doing. The prayer of the petition is denied.
In case No. 33282, the court disagrees with the position of the respondent. The court, therefore, allows the writ and directs the respondent to re-examine and pass upon the film there involved.
Since in case No. 33283 no order was made by the Division of Film Censorship, the remedy, if any, is mandamus. The petition is dismissed.

Judgments accordingly.

*336 Weygandt, C. J., Middleton, Matthias and Zimmerman, JJ., concur.
Taet and Stewart, JJ., dissent in case No. 33265, but concur in cases Nos. 33282 and 33283.