UNITED ARTISTS CORPORATION ET AL. *v.*
MARYLAND STATE BOARD OF CENSORS

[No. 40, October Term, 1956 (Adv.)]

*Decided July 13, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, HENDERSON and HAMMOND, JJ.

*Franklin G. Allen* and *William L. Marbury,* with whom were *Piper & Marbury* on the brief, for appellants.

*C. Ferdinand Sybert, Attorney General,* with whom was *Norman P. Ramsey, Deputy Attorney General,* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This appeal is from an order of the Baltimore City Court affirming an order of the Maryland State Board of Censors eliminating a scene from the motion picture named "The Man with the Golden Arm." The appeal was taken by United Artists Corporation, the distributor of the film, and Carlyle Productions, Inc., the producer.

The original Act providing for censorship of motion pictures in Maryland was passed by the Legislature forty years ago. That Act provided that the Maryland State Board of Censors shall consist of three members, who shall be appointed by the Governor by and with the advice and consent of the Senate. It directed that the Board "shall approve such films, reels or views which are moral and proper, and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the Board, to debase or corrupt morals." Laws 1916, ch. 209.

It was originally held by the United States Supreme Court in 1915 in *Mutual Film Corporation v. Industrial Commission of Ohio,* 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552, that freedom of speech and publication was not violated by an Ohio statute which provided for the creation of a Board of Censors to approve only such films as are of a moral, educational, or amusing and harmless character. But in 1952 the Court in *Joseph Burstyn, Inc. v. Wilson,* 343 U. S. 495, 72 S. Ct.

777, 96 L. Ed. 1098, held that the New York statute which permitted the banning of motion picture films on the ground that they are "sacrilegious" was invalid as an unconstitutional abridgement of free speech and free press as applied to the banning of the motion picture "The Miracle." Again in 1952 the Court held that a municipal ordinance which authorized a local Board of Censors to deny a license for the showing of a motion picture which the Board is of the opinion is "of such character as to be prejudicial to the best interests of the people" offended the Due Process Clause of the Fourteenth Amendment of the Federal Constitution. *Gelling v. State of Texas,* 343 U. S. 960, 72 S. Ct. 1002, 96 L. Ed. 1359.

In 1955 the Court in *Holmby Productions, Inc. v. Vaughn,* 350 U. S. 870, 76 S. Ct. 117, 193, 100 L. Ed. 73, held that the Kansas statute authorizing the Board of Censors to disapprove of such motion picture films as are "cruel, obscene, indecent, or immoral, or such as tend to debase or corrupt morals," was unconstitutional as applied to that case.

In 1955 the Legislature amended the statute by striking out the word "sacrilegious" and stating more specifically what types of films the Board must disapprove. The new law, Laws 1955, ch. 201, Code Supp. 1955, art. 66A, sec. 6, provides as follows:

> "(a) The Board shall examine or supervise the examination of all films or views to be exhibited or used in the State of Maryland and shall approve and license such films or views which are moral and proper, and shall disapprove such as are obscene, or such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes. All films exclusively portraying current events or pictorial news of the day, commonly called news reels, may be exhibited without examination and no license or fees shall be required therefor.
>
> "(b) For the purposes of this article, a motion picture film or view shall be considered to be obscene if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse

sexual desires, and if the probability of this effect is so great as to outweigh whatever other merits the film may possess.

"(c) For the purposes of this article, a motion picture film or view shall be considered to be of such a character that its exhibition would tend to debase or corrupt morals if its dominant purpose or effect is erotic or pornographic; or if it portrays acts of sexual immorality, lust or lewdness, or if it expressly or impliedly presents such acts as desirable, acceptable or proper patterns of behavior.

"(d) For the purposes of this article, a motion picture film or view shall be considered of such a character that its exhibition would tend to incite to crime if the theme or the manner of its presentation presents the commission of criminal acts or contempt for law as constituting profitable, desirable, acceptable, respectable or commonly accepted behavior, or if it advocates or teaches the use of, or the methods of use of, narcotics or habit-forming drugs."

The 1955 Act also gives to any person submitting a film to the Board for examination the right to take an appeal not only to the Baltimore City Court, but also from a decision of the Baltimore City Court to the Court of Appeals of Maryland. Laws 1955, ch. 201, Code Supp. 1955, art. 66A, sec. 19. This is the first appeal that has been brought to the Court of Appeals under this statute.

Appellants submitted the film to the State Board of Censors for approval and license, and the Board found that one of the scenes violates the statute. This scene, which runs less than two minutes, shows Frankie Machine, a young Chicago tough, played by Frank Sinatra, taking a narcotic after six months in the United States Public Health Service Hospital for Drug Addicts at Lexington, Kentucky. Ostensibly he was cured, but all the pressures were there waiting for him. The scene shows him rolling up his sleeve, and tying a necktie around the upper arm, while a dope "pusher" prepares the drug for injection. While the particular kind of narcotic is not named,

the picture shows the powdered narcotic, the liquid solution, the spoon, and the hypodermic needle. The "pusher" takes the filled needle and advances toward Frankie. The actual injection is not shown, but the viewer sees the needle being removed from the arm. Just before the needle is pulled out, Frankie indicates by a facial twitch that he felt a slight pain from the injection. Complete relaxation follows.

On January 12, 1956, C. Morton Goldstein, Chairman of the State Board of Censors, issued the following order: "Following Frankie entering Louie's room and removing his coat, eliminate all views from the point where Frankie is shown rolling up his sleeve down to the point immediately preceding his reclining on couch."

Appellants appealed to the Board for a re-examination of the film. The film was re-examined on February 8 by the chairman and the vice chairman, and on February 10 the Board passed another order sustaining its order of January 12.

On February 20 appellants appealed from the Board's order to the Baltimore City Court. They attacked the statute as unconstitutional, and also charged that the Board's order was arbitrary, capricious, and beyond its powers.

At the trial in the Court below, George J. Schaefer, sales supervisor for the producer of the film, testified that the film as presented to the Board had been passed by the censors without any elimination in every State, except Maryland, and had also been shown without elimination in England and on the Continent. He added that in Holland it received a scientific and cultural award resulting in the remission of admission taxes to patrons who viewed the picture. He also explained why appellants have opposed so strenuously the cutting of the scene:

> "If you will recall, Frankie, when he goes home from Lexington, believes that he has been cured, and we later find out that, because of his surroundings and circumstances, things over which he has no control, he has a craving for a 'fix.' * * * That is what we call a climax, applying to that point. He refuses to go with the 'pusher,' as you may call him; and

finally succumbs and does go over. You go into the room, and see the 'pusher' open the drawer. * * * It is my belief that the climax at that particular point was the surrendering of Frankie to the injection. If you had shown that picture without that terrific impact, and all of a sudden simply show him lying on the couch, it is my opinion * * * would have done harm to the presentation of the picture, to the dramatic climax."

Chairman Goldstein informed the Court that the Board had ordered the elimination of the scene on the ground that it "teaches" the use of, or methods of use of, narcotics or habit-forming drugs; but he admitted that the Board did not consider whether the scene "advocates" such use or methods of use.

On May 17 Judge Byrnes upheld the constitutionality of the statute, and further decided that the scene violates the statute because it "teaches the use of, or the methods of use of, narcotics or habit-forming drugs." He thereupon entered the order affirming the order of the Board.

Appellants suggested that if we should give the word "teach" its ordinary meaning, namely to make aware by information, instruction, or experience, it would be necessary to hold Section 6 (d) unconstitutional. But we need not decide whether such an interpretation would render Section 6 (d) unconstitutional, because we are convinced that the clause "or if it advocates or teaches the use of, or the methods of use of, narcotics or habit-forming drugs" means advocacy and teaching with the purpose of inducing or encouraging. The statute is directed at advocacy, not discussion.

It is impossible to believe that the Legislature intended otherwise when we consider that it has passed a statute requiring that the study of the nature of narcotics and alcoholic drinks and their effects upon the human system shall be included in the curriculum in connection with the study of physiology and hygiene in the public schools and in all State-aided institutions of learning. The Legislature has commanded that this mandate be enforced by the Superintendent

of Public Schools of Baltimore City, all Boards of School Commissioners, and the boards of all educational institutions receiving aid from the State. Code 1951, art. 77, secs. 86, 87.

Our definition is not a strained or novel one. *Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 863, 95 L. Ed. 1137, is a precedent for such an interpretation. In that case the Court had under consideration the Smith Act, which makes it unlawful to "advocate or teach" the desirability or propriety of overthrowing any government in the United States by force or violence. That Act was attacked on the grounds that by its terms it prohibits academic discussion of the merits of Marxism-Leninism, and that it stifles ideas and is contrary to all concepts of a free speech and a free press. The Court, however, refused to hold that the language of the Act had that significance. In the opinion announcing the judgment of the Court, Chief Justice Vinson made the following comment:

> "The very language of the Smith Act negates the interpretation which petitioners would have us impose on that Act. It is directed at advocacy, not discussion. Thus, the trial judge properly charged the jury that they could not convict if they found that petitioners did 'no more than pursue peaceful studies and discussions or teaching and advocacy in the realm of ideas.' He further charged that it was not unlawful 'to conduct in an American college and university a course explaining the philosophical theories set forth in the books which have been placed in evidence.' Such a charge is in strict accord with the statutory language, and illustrates the meaning to be placed on those words. Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity in which the evidence showed these petitioners engaged."

After deciding upon this interpretation, we have no difficulty in finding from the record that the censored part of the

film does not "advocate or teach" the use of, or the methods of use of, narcotics. On the contrary, the evidence is strong and convincing that the picture is likely to have a beneficial effect as a deterrent from the use of narcotics.

Dr. Hubert S. Howe, former Clinical Professor of Neurology in the College of Physicians and Surgeons of Columbia University, and member of the Committee on Narcotics among Teen-age Youth of the Welfare and Health Council of New York City, who attended a preview of the picture shortly before it opened on Broadway, gave high praise to the picture in the following statement:

> "In my opinion there was nothing in the picture which would lead any juvenile, or other person, to wish to experiment with narcotic drugs. I have been asked particularly about the scene in which the 'pusher' prepares an injection for Frankie, showing the equipment to be used. I clearly recall this scene, and certainly there was nothing in it, or in any other part of the picture, which might have a tendency to incite any one to use narcotic drugs. In fact, in my opinion, this picture would have the effect of deterring individuals from experimenting with narcotic drugs, as it portrays how easily the habit is acquired. Education of the public through the schools and moving pictures, etc., under our present conditions, are the best methods to combat the menace of narcotic drug addiction, in my opinion."

The same view was expressed by Dr. Eli K. Marshall, Professor Emeritus of Pharmacology and Therapeutics in the Medical School of the Johns Hopkins University. In reply to the question whether he thought the scene in this picture would tend to induce the use of narcotics, he testified:

> "I would think it would have the opposite effect; that the preparation necessary for the intravenous injection would not be sufficient to anyone who did not know what an intravenous injection was; and other people having blood taken, by having blood taken in

the hospital, they knew and actually saw what a venal puncture was, so I do not see it would make any difference one way or the other."

Dr. Russell S. Fisher, Professor of Legal Medicine in the Medical School of the University of Maryland and Chief Medical Examiner in the Maryland Department of Postmortem Examiners, said in reply to the question whether the picture would have a tendency to incite a desire to use narcotics:

"This, of course, is a matter of one's philosophy and teaching. I know there are people who feel any knowledge about anything that is sinful or evil should be kept closely guarded and not passed out. The opposite school of philosophy and teaching, in which one hopes to educate the public about those sinful and harmful things and, coupled with it, the disastrous effect of them is, I think, the school from which the people who prepared this movie come. That is the school to which I belong, that teaches of the danger of this dread habit, to the point, we hope, of discouraging even traffic in drugs. * * * I believe this film is beneficial in that it portrays a broadside picture of the effects of narcotics on a man's personality."

Prominent educators also entertain the view that every effort should be made to inform both adults and children about the evils of narcotics. The booklet of suggestions issued by the Board of Education of the City of New York on the subject of narcotics contains the following statement of a leading school official:

"It is my considered opinion that the time for a direct educational assault on this problem has come. There is also the reason of common sense which compels it. We do not avoid marking a thin spot on the ice of a skating pond because we fear some daredevil may be lured to try it. Nor do we avoid

teaching a small child the dangers of fire because he may become an arsonist."

The following information has been given in Instructional Guide on Narcotic Education, issued by the Department of Education of the State of New Jersey:

"Heroin has a price of around $1,000 an ounce. It is impossible for the addict to obtain pure heroin or morphine. The original pure product is 'cut' by the addition of sugar or milk ten or even fifty times. This adulteration gives an estimate of the great profits obtained by criminal peddlers.

"Many drug addicts use regular hypodermic syringes and needles. Others who are unable to buy these syringes use an ordinary medicine dropper. They wrap a piece of paper or adhesive around the end of the dropper and secure the needle around it. * * * The addict carries a small vial of water, a teaspoon, and his supply of narcotic in powder or in tablet form."

Nathan E. Rudd, Health Education Co-ordinator in New York City, a high authority on the subject of drug addiction, having addressed supervisors and teachers, parent groups, and civic organizations, and discussed the subject with thousands of teen-agers, declared, after seeing the picture in New York, that it should be a "must" for young and old. He gave it the following recommendation:

"The picture presented an accurate portrayal of the many problems facing the drug addict and the responsibility of society. * * *

"The taking of addicting drugs by injection is a matter of common knowledge. Reference to this is made continually by the press and magazines. In my opinion, this scene will not entice a youngster to begin experimenting with narcotics.

"As a whole, I consider the picture an excellent work of propaganda exposing the gravity of the. problem and the many complicating factors affecting

it. It is an authentic and well-done dramatization of the problems of the addict and the difficulty of being cured once addicted.

"I would recommend this picture without reservation as a valuable weapon in the area of preventive education dealing with the problem of drug addiction among teen-agers. This picture should serve as a deterrent."

The State Board of Censors relied on the fact that "The Man with the Golden Arm" did not receive the seal of approval of the Motion Picture Producers Association. However, that Association's disapproval of the picture was inevitable, as the Motion Picture Production Code disapproves of any motion pictures which portray addiction to narcotics. There was testimony in this case that United Artists Corporation resigned from the Motion Picture Producers Association because it did not agree with the taboo of the Association against films dealing with narcotics.

As the record in this case does not show that the censored part of the film violates the statute, the order of the Court below affirming the order of the Board will be reversed.

*Order reversed, with costs.*